# EXHIBIT A

**Declaration of Catherine E. Lhamon
(ECF No. 95-1) (Nov. 7, 2016)**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 7:16-cv-54-O |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF CATHERINE E. LHAMON

I, Catherine E. Lhamon, hereby make the following declaration with respect to the above-captioned matter:

1. I am the Assistant Secretary for Civil Rights in the U.S. Department of Education (ED or the Department), Office for Civil Rights (OCR), in Washington, D.C. I have held this position since August 2013. My current work address is 400 Maryland Avenue, SW, Washington, D.C.

2. In my current capacity as Assistant Secretary for Civil Rights, I am the principal advisor to the Secretary of Education on civil rights matters. I oversee a full-time staff of nearly 600 employees in OCR's headquarters in Washington, D.C., and OCR's 12 regional enforcement offices around the country.

3. I make this declaration on the basis of personal knowledge and information made available to me in the course of my official duties.

### The Department's Mission and Title IX Enforcement

4. The Department's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access. Congress

created the Department to strengthen the federal commitment to equal educational opportunity for every individual.[1] In support of the Department's mission, OCR's core purpose is to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights.[2]

5.  OCR enforces several federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department. Discrimination on the basis of race, color, and national origin is prohibited by Title VI of the Civil Rights Act of 1964; sex discrimination is prohibited by Title IX of the Education Amendments of 1972 (Title IX); discrimination on the basis of disability is prohibited by Section 504 of the Rehabilitation Act of 1973; and age discrimination is prohibited by the Age Discrimination Act of 1975. These civil rights laws enforced by OCR extend to all state educational agencies, elementary and secondary school systems, colleges and universities, vocational schools, proprietary schools, state vocational rehabilitation agencies, libraries, and museums that receive ED funds (recipients). Areas covered may include, but are not limited to: admissions, recruitment, financial aid, academic programs, student treatment and services, counseling and guidance, discipline, classroom assignment, grading, vocational education, recreation, physical education, athletics, housing, and employment. OCR also enforces Title II of the Americans with Disabilities Act of 1990 (prohibiting disability discrimination by public entities, whether or not they receive federal financial assistance). In addition, as of January 8, 2002, OCR enforces the Boy Scouts of America Equal Access Act (Section 9525 of the Elementary and Secondary Education Act of 1965, as amended by the No Child Left Behind Act of 2001).

6.  OCR's core activities include: (i) responding to civil rights complaints filed by the public and conducting proactive investigations, typically called compliance reviews; (ii) monitoring

---

[1] U.S. Department of Education Organization Act, 20 U.S.C. § 3402(1).
[2] *See* U.S. Department of Education, About OCR, www.ed.gov/ocr/aboutocr.html.

recipients' adherence to resolution agreements reached with OCR; (iii) answering stakeholder inquiries and issuing policy guidance to increase recipients' understanding of their civil rights obligations and students' awareness of their civil rights; (iv) responding to requests for information from and providing technical assistance to the public; and (v) administering and disseminating the Civil Rights Data Collection (data on key education and civil rights issues in U.S. public schools, including student enrollment and educational programs and services).

7.  Virtually all of the civil rights violations that OCR finds are resolved through voluntary agreements, known as "resolution agreements." It is the strong preference of OCR, consistent with the statute, to seek voluntary compliance by recipients. Under a resolution agreement, a recipient of federal funds who is the subject of a complaint (such as a school district) voluntarily agrees to take remedial actions that, when fully and effectively implemented, will address all of OCR's compliance concerns and any identified violations.

8.  If OCR determines that a fund recipient is not complying with its civil rights obligations, including its Title IX obligations, OCR can initiate administrative proceedings to withhold further funds; or it can refer the matter to the U.S. Department of Justice (DOJ) to file a civil action to enjoin further violations. See 20 U.S.C. § 1682; 34 C.F.R. § 100.8(a).

9.  Resolution agreements are effective to the extent that they are implemented. To ensure that parties follow through with their commitments, OCR actively monitors cases that have resolution agreements until the recipient meets all provisions. When a case is in monitoring, OCR's role is to assess the recipient's implementation of the resolution agreement to ensure that the institution effectively implements its commitments and that the recipient is in compliance with the statute(s) and regulation(s) at issue. This monitoring function is a significant and important tool in OCR's overall enforcement scheme and is essential to OCR's mission of ensuring compliance with civil rights laws and ensuring equal access to educational excellence for all students.

10.    OCR also provides technical assistance in the form of presentations to educators, students,

families, and other stakeholders, as well as answering individual questions about the laws that

OCR enforces. Providing technical assistance is a core part of OCR's enforcement of federal

civil rights laws and helps to better inform recipients, students, and others, about what the law

is and how OCR interprets these laws.

ED's Interpretation of Discrimination on the Basis of Sex and

Issuance of the May 2016 Dear Colleague Letter

11.    ED has proactively sought to better understand the educational experiences and challenges

facing a diverse range of students, including transgender students. "Transgender" is a term

describing those individuals whose gender identity is different from the sex they were

assigned at birth. For instance, a transgender male is someone who identifies as male, but was

assigned the sex of female at birth.

12.    As part of its examination of the application of civil rights laws to transgender students, OCR

and other ED representatives, including then-Secretary Arne Duncan, held listening sessions

beginning in 2010 with various stakeholders, including transgender students and parents or

guardians of both transgender and non-transgender students, as well as representatives from

school board organizations, school administrators, faith leaders, athletics associations,

educators, and institutions of higher education. Through these numerous engagements, ED

chiefly learned about the issues transgender students and their peers face at school, the

concerns of parents or guardians of transgender students as well as of parents or guardians of

students who are not transgender, and the various ways that school administrators have

ensured equal treatment of and created supportive environments for transgender students, and

all students, in their schools.

13.    ED also received many inquiries from educators, state education agencies, students, families,

legislators, and the public about the application of Title IX to transgender students. In

addition, many stakeholders wrote letters documenting the challenges transgender students

4

face and urging the Department to issue guidance clarifying recipients' obligations under Title IX. For example, in May 2014, "a diverse group of advocates in the education, civil rights, youth development and mental health communities, including educators and school-based professionals, parents, and consumers of educational and mental health services" signed a letter urging the Department "to release guidance clearly outlining the appropriate treatment of transgender and gender non-conforming students under Title IX." *See* Exhibit 1, Letter to Catherine Lhamon, Assistant Secretary for Civil Rights (May 15, 2014). The letter laments that "[w]ithout explicit guidance on this issue, transgender students must attend school in an unwelcoming, or harmful, school environment while school administrators and parents attempt to negotiate a solution." The letter cites the 2011 School Climate Survey conducted by the Gay, Lesbian and Straight Education Network (GLSEN), which found that "[a]mong the more than 700 transgender students in grades 6 through 12 who responded to the survey, 80% reported feeling unsafe at school, 75.4% reported being verbally harassed, and 16.8% reported being physically assaulted. This and other surveys have found that this victimization contributes to a host of negative outcomes for transgender youth, including decreased educational aspirations, academic achievement, self-esteem, and sense of belonging in school, and increased absenteeism and depression. Transgender youth experience serious negative mental health outcomes as the result of factors such as discrimination and victimization; nearly half of young transgender people have seriously thought about taking their lives and one quarter report having made a suicide attempt. Without proper guidance, school policies can often contribute to negative outcomes for transgender youth in schools."

14.    ED analyzed current medical and scientific information regarding gender identity, gender dysphoria, and gender transition. For example, OCR consulted the American Psychological Association's *Answers to Your Questions about Transgender People, Gender Identity, and Gender Expression*, www.apa.org/topics/lgbt/transgender.aspx ("Transgender people

experience their transgender identity in a variety of ways and may become aware of their transgender identity at any age." ... "It is not helpful to force the child to act in a more gender-conforming way."), and the World Professional Association for Transgender Health's *Standards of Care*,

www.wpath.org/site_page.cfm?pk_association_webpage_menu=1351&pk_association_webpage=3926 ("Children as young as two may show features that could indicate gender dysphoria" ... "Changing gender role can have profound personal and social consequences, and the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role.").

15. ED also reviewed relevant decisions from numerous federal courts as well as federal agency decisions related to sex discrimination under laws such as Title VII of the Civil Rights Act of 1964 and under the Equal Protection Clause of the 14th Amendment to the U.S. Constitution.

16. Finally, ED met with employees of DOJ and other federal agencies in developing its interpretation of Title IX's application to transgender students.

17. Under ED's Title IX implementing regulations, which were originally promulgated by ED's predecessor agency in 1975, a recipient may provide separate facilities – *e.g.,* toilet, locker room, and shower facilities – on the basis of sex, provided that any facilities provided for students of one sex are comparable to such facilities provided for students of the other sex. *See* 34 C.F.R. § 106.33. Nonetheless, ED's regulations do not define "one sex" and "the other sex," nor do they state whether transgender students must be provided access to sex-segregated facilities consistent with their gender identity.

18. After multiple years of studying this issue in consultation with school administrators, educators, transgender students and students who are not transgender, other federal agencies, among others, and after consulting existing case law and scientific research, ED concluded that preserving transgender students' equal access to sex-segregated facilities required that

they have access to the facilities that match their gender identity. ED also reviewed and considered the accommodations provided by recipients to transgender students and other students who may wish additional privacy, and found that recipients have been able to accommodate the privacy concerns of transgender and non-transgender students alike while still allowing transgender students to access sex-segregated facilities consistent with their gender identity. ED has indicated that schools may make individual-user options available to all students who voluntarily seek additional privacy.

19.     Thus, for the first time, in 2013, after a two-year investigation, OCR, jointly with DOJ, resolved a Title IX complaint against Arcadia Unified School District in California. In that case, a transgender boy alleged that he had been denied access to the boys' restroom and locker room, and instead was required to use the private restroom in the school health office as both a restroom and a changing area for physical education class. The Student reported that:

- Because the school health office was located some distance away from the school gym and the location of the Student's classes, the Student regularly missed class time.

- On several occasions, the Student missed instructions not to change into gym clothes because the Student was not in the locker room, which attracted unwanted attention.

- Because he was required to store his gym clothes in a bin under the cot used by students who were not feeling well, when retrieving his gym clothes the Student sometimes faced questions from other students in the health office.

- To use the restroom during class time, the Student was required to walk across campus, missing class time and facing questions from classmates about the length of time he was away.

- The Student occasionally found the health office locked, requiring him to find an employee to unlock it for him.

The Student also reported that similar difficulties occurred on other occasions, such as during an evening dance, when the Student was unwilling to ask for special permission to leave the dance area and look for an employee to unlock the health office for him. Eventually, the Student reported that he avoided using the restroom altogether. The Student also alleged that he was not allowed to stay with other boys during a class trip, and instead was required to stay in a separate cabin with his parent. Before the trip, the Student was very upset by the District's decision to require him to stay in his own cabin and became very distracted from his school work. Until several days before the camp, the Student told OCR he considered not participating in the trip at all. He told OCR that during the trip, he was sad and upset. The Student reported that he faced questions from other students about his cabin arrangement and that because the Student was not comfortable being truthful about his circumstances, the Student felt that this dishonesty created a distance between him and his peers. Among other measures, the resolution agreement[3] provided the transgender boy with access to sex-segregated facilities designated for male students consistent with his gender identity, ensured that he would be treated the same as other male students in all respects in the education programs and activities offered by the District, and ensured that any school records containing the Student's birth name or reflecting the Student's assigned sex would be treated as confidential and maintained separately from the Student's records, and would not be disclosed without written consent. The resolution agreement also included District-wide measures, including revised policies, procedures, regulations, and documents and materials related specifically to discrimination based on a student's gender identity, gender expression,

---

[3] OCR Case No. 09-12-1020, *Arcadia Unified Sch. Dist., CA* (July 24, 2013), www.justice.gov/crt/about/edu/documents/arcadialetter.pdf (closure letter); and www.justice.gov/crt/about/edu/documents/arcadiaagree.pdf (resolution agreement).

gender transition, transgender status, or gender nonconformity. In addition, the District agreed to revise existing policies to ensure that all students are provided with equal access to its programs and activities, modify current policies or develop a comprehensive gender-based non-discrimination policy, and develop an implementation guide addressing the application of the District's gender-based discrimination policy. I also read the *amicus curiae* brief filed by several school administrators in *G.G. v. Gloucester County School Board*, 822 F.3d 709 (4th Cir. 2016) (No. 15-2056), in which the Superintendent of Arcadia Unified School District, David Vannasdall, is quoted as saying that, "If [students are] worrying about the restroom, they're not fully there to learn, but instead just trying to navigate their day. Give students the opportunity to just be a kid, to use the bathroom, and know that it's not a disruption, it just makes sense."

20. Consistent with the majority of recent judicial decisions and agency determinations described above, in April 2014, OCR issued policy guidance explicitly articulating the broad notion that—just like other federal sex discrimination laws—Title IX protects against discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity.[4] This policy guidance, as with all of OCR's significant guidance documents,[5] underwent interagency review.

21. The number of complaints filed with OCR that allege discrimination against transgender students has increased significantly in the time since OCR opened its investigation of Arcadia Unified School District in 2011, and clarified its interpretation of Title IX and its implementing regulations with respect to discrimination based on gender identity. OCR received two such complaints in 2011, three such complaints in 2012, nine such complaints in 2013, seven such complaints in 2014, 46 such complaints in 2015, and 84 such complaints in

---

[4] OCR, Questions and Answers on Title IX and Sexual Violence (2014), www.ed.gov/ocr/docs/qa-201404-title-ix.pdf.
[5] Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), www.whitehouse.gov/sites/default/files/omb/memoranda/fy2007/m07-07.pdf.

2016 (as of October 20, 2016). This may result from an increase in students' willingness to acknowledge to school officials that they are transgender, and that they seek being treated consistent with their gender identity, including being given access to facilities consistent with their gender identity.

22.    Between 2013 and June 2016, OCR entered into nine other resolution agreements with recipients to resolve allegations of discrimination against transgender students. Six of those cases involved allegations that transgender students were denied access to sex-segregated facilities consistent with gender identity and suffered harm as a result. All of the schools involved in those resolutions are located in non-plaintiff states. For example:

a.    In August 2015, after an investigation that lasted over a year, OCR settled with Central Piedmont Community College in North Carolina.[6] The complaint alleged that the College discriminated against the Student based on her gender when College personnel asked her to provide identification and medical documentation to verify her sex and suspended her as a result of her failure to do so. Because of this incident, the Student told OCR that she failed all of her classes that semester, would be required to retake them, and had to attend regular psychotherapy. Under the resolution agreement, the College has voluntarily agreed to notify all students of their right to use the restroom corresponding with their gender identity, ensure personnel honor requests by students wishing to be referred to by a different name and/or gender, and establish a policy for students requesting to change the name and gender in their official school records. As a result of the agreement, students at the College, including transgender students, are permitted to use sex-segregated facilities and their chosen names and pronouns without presenting medical records or identification documents and without fear of reprisal.

---

[6] OCR Case No. 11-14-2265, *Cent. Piedmont Cmty. Coll., SC* (Aug. 14, 2015), www.ed.gov/ocr/docs/investigations/more/11142265-a.pdf (letter of findings); and www.ed.gov/ocr/docs/investigations/more/11142265-b.pdf (resolution agreement).

b. In December 2015, after a two-year investigation, OCR settled with Township High School District 211 in Illinois.[7] OCR determined that the District denied a 14-year-old transgender girl access to the girls' locker room and instead required her to use separate facilities to change clothes for her mandatory physical education classes. As result of the District's denial of access for the Student to its girls' locker rooms, the Student not only received an unequal opportunity to benefit from the District's educational program, but also experienced an ongoing sense of isolation and ostracism throughout her high school enrollment. In addition, the Student missed receiving information and access to rental gym uniforms provided to other students in the locker rooms and missed opportunities for bonding with her teammates in the locker rooms. In the resolution agreement, the District agreed to provide the Student with access to female locker room facilities consistent with her gender identity, and to take steps to protect the privacy of all its students by installing and maintaining sufficient privacy curtains within the girls' locker rooms to accommodate the Student and any other student who wishes to be assured of privacy while changing.

c. In December 2015, after a two-year investigation, OCR resolved a complaint against Broadalbin-Perth Central School District in New York. In that case a 9-year-old transgender girl alleged that she was required to use a gender-neutral restroom in the nurse's office or a family restroom. As OCR noted in its letter of findings in this case, "The Student was reluctant to use the nurse's office or the family restroom because the student felt stigmatized and 'like a freak.'" In addition, the Student's mother reported that the Student had limited trips to the restroom and on some school days did not even visit

---

[7] OCR Case No. 05-14-1055, *Township High School Dist. 211, IL* (Dec. 3, 2015). www.ed.gov/ocr/docs/investigations/more/05141055-a.pdf (closure letter); and www.ed.gov/ocr/docs/investigations/more/05141055-b.pdf (resolution agreement).

the restroom at all, in order to avoid feelings of isolation. This case was resolved on

December 22, 2015. Under the resolution agreement, the District voluntarily agreed to

adopt and publish revised grievance procedures and notices of nondiscrimination in all

relevant policies, and to provide assurance that the District will take steps that will

prevent the recurrence of discrimination and harassment and will remedy the effects of

discriminatory actions.

d.   In June 2016, after a nine-month investigation, OCR settled with Dorchester County

School District in South Carolina.[8] In that case, parents of a transgender girl filed a

complaint with OCR because their daughter was denied access to the sex-segregated

restrooms in the third grade, and instead was required to use the private restroom in the

nurse's office, which was located in a different wing of the school, or the private

restroom in the assistant principal's office, which was at the end of the hallway from

where the Student's classroom was located. During group restroom breaks on their way

to or from lunch or recess, the Student was required to leave her female friends and to use

the private restroom in the assistant principal's office. This embarrassed the Student

because she was forced to separate from her friends, who would often request to

accompany her to the restroom, and because it required the Student to address questions

from her classmates about why she was using a different restroom. The resolution

agreement provided that the District would allow the Student access to sex-segregated

facilities designed for female students and equal access to other programs and activities,

as well as District-wide measures: to include gender-based discrimination in its

nondiscrimination notice, revise and ensure all policies, procedures and regulations

provide equal access to transgender and gender-nonconforming students, provide training

---

[8] OCR Case No. 11-15-1348, *Dorchester Cnty. Sch. Dist., SC* (June 21, 2016).
www.ed.gov/ocr/docs/investigations/more/11151348-a.pdf (letter of findings); and
www.ed.gov/ocr/docs/investigations/more/11151348-b.pdf (resolution agreement).

on gender-based discrimination, and include gender-based discrimination in student bullying prevention materials.

23. During that same time period, resolution agreements were reached in eight complaints involving transgender students through OCR's Early Complaint Resolution process (ECR). ECR facilitates the resolution of complaints by providing an early opportunity for the parties involved to voluntarily resolve the complaint allegations. Unlike other resolution agreements with recipients, OCR does not sign, approve, endorse, or monitor any agreement reached between the parties.

24. On May 13, 2016, OCR and DOJ jointly issued a Dear Colleague Letter (DCL) on transgender students' rights under Title IX. In the DCL, OCR and DOJ articulated our interpretation that Title IX and its implementing regulations require recipients to allow a transgender student access to restrooms and other sex-separate facilities that match the student's gender identity.[9]

25. Also in May 2016, in conjunction with the DCL, the Department's Office of Elementary and Secondary Education released a document, entitled *Examples of Policies and Emerging Practices for Supporting Transgender Students*, that is a compilation of policies and practices that schools across the country were already using to support transgender students.[10] The policies and practices highlighted in that document include examples of state and local efforts to support transgender students in the context of sex-segregated facilities.  For example:

   a. In Washington State, guidelines provide: "School districts should allow students to use the restroom that is consistent with their gender identity consistently asserted at school." In addition, no student "should be required to use an alternative restroom because they are transgender or gender nonconforming." These guidelines further provide that any

---

[9] OCR, DCL on Transgender Students (2016), www.ed.gov/ocr/letters/colleague-201605-title-ix-transgender.pdf.
[10] Examples of Policies and Emerging Practices for Supporting Transgender Students (May 13, 2016), www.ed.gov/oese/oshs/emergingpractices.pdf.

student who wants increased privacy should be provided access to an alternative restroom or changing area.

b.   A regulation issued by Nevada's Washoe County School District provides: "Students shall have access to use facilities that correspond to their gender identity as expressed by the student and asserted at school, irrespective of the gender listed on the student's records, including but not limited to locker rooms."

c.   In Alaska, the Anchorage School District's Administrative Guidelines emphasize the following provision: "However, staff should not require a transgender or gender nonconforming student/employee to use a separate, nonintegrated space unless requested by the individual student/employee."

d.   The New York State Department of Education guidance gives an example of accommodating all students' interest in privacy: "In one high school, a transgender female student was given access to the female changing facility, but the student was uncomfortable using the female changing facility with other female students because there were no private changing areas within the facility. The principal examined the changing facility and determined that curtains could easily be put up along one side of a row of benches near the group lockers, providing private changing areas for any students who wished to use them. After the school put up the curtains, the student was comfortable using the changing facility."

Effect of the Injunction on OCR's Title IX Enforcement

26.   Before the October 18, 2016, clarification, OCR had suspended investigations and monitoring of resolution agreements for 73 pending matters involving transgender students to comply with the Court's August 21, 2016, preliminary injunction, including 37 pending complaints filed from states that are not involved in this litigation as Plaintiffs.

27.   In light of the October 18, 2016, clarification, OCR has continued to suspend investigation and monitoring of 21 pending matters in full and 14 pending matters in part because they

involve allegations related to access to sex-segregated facilities. Of those pending matters that continue to be suspended, there are 25 pending complaints suspended in whole (13) or in part (12) that were filed from states that are not involved in this litigation as Plaintiffs.

28. Despite the August 21, 2016, preliminary injunction, OCR continues to receive Title IX complaints alleging discrimination against transgender students, including six complaints since August 21, 2016. Many of those complaints allege harms similar to the harms that have been remedied in the resolution agreements OCR negotiated before the preliminary injunction was issued. Those allegations related to access to sex-segregated facilities cannot be investigated in light of the preliminary injunction and the clarification order.

29. Because OCR has not opened any of these complaints for investigation, OCR has been unable to assist any of the affected recipients (i.e., schools or school districts) in reaching the kinds of resolution agreements that have proven successful in the past, such as in the cases described above. Therefore, as a result of the preliminary injunction, even recipients who would be entirely willing to work with OCR to find ways to accommodate the needs of their transgender students consistent with federal law are unable to obtain OCR's assistance in doing so. The preliminary injunction thus frustrates OCR's ability to apply its resources and expertise to assist schools in achieving these cooperative outcomes, even in states that are not plaintiffs to this litigation (and, indeed, even in those states that have participated as amicus curiae in this litigation to emphasize their agreement with OCR's interpretation of federal law).

30. OCR has received and continues to receive many requests for technical assistance from schools, state education agencies, students, and parents—including many from entities or individuals in non-plaintiff states—regarding the Title IX rights and obligations related to transgender students. OCR has declined to answer these requests, including hundreds of letters and emails, because of the uncertainty created by the preliminary injunction.

31.    The scope of the preliminary injunction prevents OCR from satisfying our regulatory charge
       to enforce, and ensure recipients' compliance with, Title IX. OCR's regulatory charge is to
       take action "whenever" we have evidence that a student's rights may be being violated.[11]
       Because OCR now operates pursuant to the August 21, 2016, injunction as clarified by the
       October 18, 2016, Order, OCR cannot provide Title IX anti-discrimination protection to a
       discrete group of students, setting them apart from all other students.

32.    In addition, the August 21, 2016, injunction imposes particular harm on transgender
       elementary and secondary students because, by law, they must attend school every day but,
       because of the injunction, they no longer enjoy the federal civil rights protection to which all
       other students are entitled.  For these students, there is no time to wait and determine how to
       treat them equitably; their state laws mandate their school attendance now and every school
       day.

33.    Facts from OCR investigations confirm the concrete harms daily experienced by transgender
       students who are denied access to sex-segregated facilities consistent with their gender
       identity. Our investigations have confirmed, for example, elementary school students have
       been required to line up by gender before a teacher grants permission for the students to go to
       restrooms.  Today, and every school day, transgender students in this situation must either
       line up consistent with their sex assigned at birth or, if a specific teacher so decides, line up
       consistent with their gender identity. That daily choice of course, as OCR investigations
       confirm, leaves a student subject to commentary and questions from peers if the student joins
       a line that is inconsistent with the student's apparent gender identity, or if the transgender
       student does not join a line at all. Students and their families have reported to OCR, during

---

[11] *See* 34 C.F.R. § 100.7 ("The responsible Department official or his designee will make a prompt investigation
whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply
with this part.") and 34 C.F.R. § 106.71 ("The procedural provisions applicable to title VI of the Civil Rights Act of
1964 are hereby adopted and incorporated herein by reference. These procedures may be found at 34 CFR 100.6–
100.11 and 34 CFR, part 101.").

investigations, that the students feel shame, humiliation, and experience depression resulting from these harms. In addition, students as young as elementary school students as well as high school and college students, and their families have reported to OCR that the students have attempted death by suicide, among other self-injurious expressions and consequences of these harms. Furthermore, through OCR's investigations and ED's analysis of reports and medical and scientific literature—including material from the APA and WPATH—ED is aware that transgender students who are denied access to restrooms and other sex-segregated facilities that match their gender identity, and who are otherwise not treated consistent with their gender identity, may suffer significant dignitary, psychological, medical, and other harms. By being prohibited from working on these cases, we are unable to fulfill the Department's mission and OCR's core purpose because we cannot protect the civil rights of all students at school, including those students who must face such discriminatory environments daily. Given that practical reality, the August 21, 2016, injunction imposes harm on all students in schools because it sends them a message that discrimination against an identifiable group is permissible and without federal redress. That discriminatory message conflicts directly with the equality principle in Title IX.

4 November 2016
_____
Date

_____
Catherine E. Lhamon

Exhibit 1

Letter to Catherine Lhamon,

Assistant Secretary for Civil Rights

(May 15, 2014)

May 15, 2014

Assistant Secretary Catherine Lhamon
Office for Civil Rights
U.S. Department of Education
Lyndon Baines Johnson Department of Education Bldg.
400 Maryland Avenue, SW
Washington, DC 20202-1100

Dear Assistant Secretary Lhamon,

The undersigned organizations represent a diverse group of advocates in the education, civil rights, youth development and mental health communities, including educators and school-based professionals, parents, and consumers of educational and mental health services. We thank you for the Department of Education Office for Civil Rights' (OCR) continuing work to ensure that all students have equal access to education, regardless of background, circumstances, or identity. We write you today to express our gratitude for your recent clarification that Title IX protections against sex-based discrimination extend to discrimination based on gender identity and failure to conform to sex stereotypes. This clarification is an important step towards ensuring that transgender and gender non-conforming students have access to a safe and equal education. We urge you to take the next step and release guidance clearly outlining the appropriate  treatment of transgender and gender non-conforming students under Title IX of the Education Amendments of 1972.

Transgender youth and young adults are increasingly visible in our schools, with an estimated 225,000 of our pre-K through postsecondary students identifying as transgender. As you are aware, the legal landscape reflecting the treatment of transgender and gender non-conforming people under federal non-discrimination law has changed significantly in recent years. Many courts, along with the EEOC, have recognized that discrimination on the basis of a person's gender identity, gender transition, or transgender status constitutes sex discrimination under statutes such as Title VII of the Civil Rights Act of 1964.[i] Courts and state and federal agencies, including the Department of Justice's Office on Violence against Women, are also consistently taking the view that gender identity nondiscrimination requires equal access to programs and facilities that are consistent with a person's gender identity.[ii]

Many states (such as Massachusetts, Colorado, Connecticut, Maine, and Washington), universities, colleges, and school districts (including Los Angeles Unified School District, one of the nation's largest school districts) have already adopted clear policies to protect transgender students. Unfortunately, many school districts continue to ignore this vulnerable student population due to uncertainty about whether Title IX extends to transgender students. Without explicit guidance on this issue, transgender students must attend school in an unwelcoming, or harmful, school environment while school administrators and parents attempt to negotiate a solution. Our collective constituents would all benefit from guidance in this area from OCR.

We ask you to clarify the scope of Title IX's prohibition on discrimination based on a student's gender identity, transgender status, or gender transition, specifically the extent to which the law:

- Requires schools to respect students' gender identity for all purposes;
- Protects the private nature of a student's transgender status;
- Requires existing dress code policies to be enforced based on a student's gender identity and gender expression;
- Ensures access to all school programs, activities, and facilities based on gender identity; and
- Obligates schools to offer participation on athletic teams based on gender identity.

The Department of Education has already been confronted with these issues. For example, this past July, the Office of Civil Rights announced an historic resolution agreement in *Student v. Arcadia Unified School District*, which has resulted in that district developing and implementing comprehensive board policies and administrative regulations that provide transgender students the opportunity to succeed in school. Providing guidance and clarification in this regard would be more efficient and cost-effective for all parties than continued costly litigation under Title IX. Beyond the practical and financial benefits of such guidance, clarification of these rights is critical to protect the health and wellbeing of transgender and gender non-conforming youth in schools, and is consistent with accepted medical and mental health standards. Discrimination against transgender and gender non-conforming students often leads to lower academic achievement, poor psychological outcomes, and school push out.

GLSEN's 2011 School Climate Survey found that while LGBT students often faced hostile school climates, transgender students face the most hostile climates. Among the more than 700 transgender students in grades 6 through 12 who responded to the survey, 80% reported feeling unsafe at school, 75.4% reported being verbally harassed, and 16.8% reported being physically assaulted. This and other surveys have found that this victimization contributes to a host of negative outcomes for transgender youth, including decreased educational aspirations, academic achievement, self-esteem, and sense of belonging in school, and increased absenteeism and depression.[iii] Transgender youth experience serious negative mental health outcomes as the result of factors such as discrimination and victimization; nearly half of young transgender people have seriously thought about taking their lives and one quarter report having made a suicide attempt.[iv]

Without proper guidance, school policies can often contribute to negative outcomes for transgender youth in schools. Dress codes, access to sex-segregated spaces, use of proper names and pronouns, and participation on athletics teams are all school policy issues that have the potential to either powerfully affirm or stigmatize a transgender student.

Based on case law development of Title VII and Title IX, it is clear that transgender and gender non-conforming youth are protected from discrimination and harassment, but many school districts do not have a clear understanding about how these legal protections should translate to non-discriminatory school policies. As a result, transgender and gender non-conforming youth are experiencing significant health and educational disparities. Schools, parents, professionals, and most importantly, students, would benefit significantly if schools nation-wide were informed and equipped to accommodate these students in a safe, appropriate, and non-discriminatory way.

All transgender and gender non-confirming students deserve an education free from discrimination and harassment. We strongly urge you to stand by this principle and issue guidance clarifying the application of Title IX to gender identity and expression.

Respectfully,

Advocates for Youth
African American Ministers In Action-Equal Justice Task Force
American Civil Liberties Union
American Foundation for Suicide Prevention/SPAN USA
American Group Psychotherapy Association
American Psychiatric Association
American School Counselor Association
Anti-Defamation League
CenterLink: The Community of LGBT Centers
Disability Rights Education & Defense Fund
Equality Federation
Families United Against Hate (FUAH)
Family Equality Council
Gay-Straight Alliance Network
GLMA: Health Professionals Advancing LGBT Equality
GLSEN (Gay, Lesbian and Straight Education Network)
Human Rights Campaign
Ithaca LGBT Task Force
Jewish Council for Public Affairs
Keshet
League of United Latin American Citizens
NAADAC, the Association for Addiction Professionals
National Association for Children's Behavioral Health
National Association for Multicultural Education
National Association for the Education of Homeless Children and Youth
National Association of County Behavioral Health and Developmental Disability
National Association of School Psychologists
National Association of Secondary School Principals
National Center for Lesbian Rights
National Center for Transgender Equality
National Council of Jewish Women
National Disability Rights Network
National Education Association
National Gay and Lesbian Task Force
National Queer Asian Pacific Islander Alliance
PFLAG National
Safe Schools Coalition (SSC)
School Social Work Association of America
Sexuality Information and Education Council of the U.S. (SIECUS)
Sikh American Legal Defense and Education Fund (SALDEF)

Southeast Asia Resource Action Center (SEARAC)
The International Foundation for Gender Education
The Trevor Project
TransActive Gender Center
Transgender Law Center
Youth Guardian Services

---

[i] See, e.g., Glenn v. Brumby,  663 F.3d 1312  (11th Cir. 2011); Barnes v. City of Cincinnati, 401 F.3d 729 (6th Cir. 2005); Smith v. City of Salem; 378 F.3d 566 (6th Cir. 2004); Rosa v. Park W. Bank & Trust Co., 214 F.3d 213 (1st Cir. 2000); Schwenk v. Hartford, 204 F.3d 1187 (9th Cir. 2000); Schroer v. Billington, 577 F. Supp. 2d 293 (D.D.C. 2008); Lopez v. River Oaks Imaging & Diag. Group, Inc., 542 F. Supp. 2d 653 (S.D. Tex. 2008); Mitchell v. Axcan Scandipharm, Inc., No. Civ. A. 05-243, 2006 WL 456173 (W.D. Pa. Feb. 17, 2006); Tronetti v. TLC HealthNet Lakeshore Hosp., No. 03-CV-0375E(SC), 2003 WL 22757935 (W.D.N.Y. Sept. 26, 2003); Doe v. United Consumer Fin. Servs., No. 1:01 CV 1112, 2001 WL 34350174 (N.D. Ohio Nov. 9, 2001); Rentos v. OCE-Office Systems, No. 95 Civ. 7908, 1996 WL 737215, *8 (S.D.N.Y. Dec. 24, 1996); Maffei v. Kolaeton Industry, Inc., 626 N.Y.S.2d 391 (N.Y. Sup. Ct. 1995); Macy v. Holder, E.E.O.C. Appeal No. 0120120821 (Apr. 23, 2012).

[ii] See, e.g., U.S. Dept. of Justice, Office on Violence Against Women, *Frequently Asked Questions: Nondiscrimination Grant Condition of the Violence Against Women Reauthorization Act of 2013* (Apr. 9, 2014), available at: http://www.ovw.usdoj.gov/docs/faqs-ngc-vawa.pdf; Doe v. Regional School Unit 26, 86 A.3d 600 (Me. 2014); Dept. of Fair Employment & Housing v. Amer. Pacific Corp., Case No. 34-2013-00151153-CU-CR-GDS (Cal. Sup. Ct. Mar. 13, 2014); Mathis v. Fountain-Fort Carson Sch. Dist. 8, Charge No. P20130034X (Col. Div. Civ. Rts. Jun. 17, 2013); Jones v. Johnson County Sheriff's Department, CP # 12-11-61830, Finding of Probable Cause (Iowa Ct. Rts. Comm'n Feb. 11, 2013).

[iii] Greytak, E. A., Kosciw, J. G., and Diaz, E. M. (2009). Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools. New York: GLSEN.

[iv] Arnold H. Grossman & Anthony R. D'Augelli, *Transgender Youth and Life-Threatening Behaviors*, 37(5) SUICIDE LIFE THREAT BEHAV. 527 (2007).

# EXHIBIT B

**Preliminary Injunction Order
(ECF No. 58) (Aug. 21, 2016)**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:16-cv-00054-O** |
| | § | |
| **UNITED STATES OF AMERICA et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## PRELIMINARY INJUNCTION ORDER

Before the Court are Plaintiffs' Application for Preliminary Injunction (ECF No. 11), filed July 6, 2016; Defendants' Opposition to Plaintiffs Application for Preliminary Injunction (ECF No. 40), filed July 27, 2016; and Plaintiffs' Reply (ECF No. 52), filed August 3, 2016. The Court held a preliminary injunction hearing on August 12, 2016, and counsel for the parties presented their arguments. *See* ECF No. 56.[1]

This case presents the difficult issue of balancing the protection of students' rights and that of personal privacy when using school bathrooms, locker rooms, showers, and other intimate facilities, while ensuring that no student is unnecessarily marginalized while attending school. The sensitivity to this matter is heightened because Defendants' actions apply to the youngest child attending school and continues for every year throughout each child's educational career. The resolution of this difficult policy issue is not, however, the subject of this Order. Instead, the

---

[1] The Court also considers various amicus briefs filed by interested parties. *See* ECF Nos. 16, 28, 34, 36-1, 38-1.

1

Constitution assigns these policy choices to the appropriate elected and appointed officials, who must follow the proper legal procedure.

That being the case, the issues Plaintiffs present require this Court to first decide whether there is authority to hear this matter.  If so, then the Court must determine whether Defendants failed to follow the proper legal procedures before issuing the Guidelines in dispute and, if they failed to do so, whether the Guidelines must be suspended until Congress acts or Defendants follow the proper legal procedure.  For the following reasons, the Court concludes that jurisdiction is proper here and that Defendants failed to comply with the Administrative Procedures Act by: (1) foregoing the Administrative Procedures Act's notice and comment requirements; and (2) issuing directives which contradict the existing legislative and regulatory texts.  Accordingly, Plaintiffs' Motion should be and is hereby **GRANTED.**

## I.    BACKGROUND

The following factual recitation is taken from Plaintiffs' Application for Preliminary Injunction (ECF No. 11) unless stated otherwise.  Plaintiffs are composed of 13 states and agencies represented by various state leaders, as well as Harrold Independent School District of Texas and Heber-Overgaard Unified School District of Arizona.[2]  They have sued the U.S. Departments of Education ("DOE"), Justice ("DOJ"), Labor ("DOL"), the Equal Employment Opportunity Commission ("EEOC"), and various agency officials (collectively "Defendants"), challenging Defendants' assertions that Title VII and Title IX require that all persons must be afforded the opportunity to have access to restrooms, locker rooms, showers, and other intimate

---

[2] Plaintiffs include: (1) the State of Texas; (2) Harrold Independent School District (TX); (3) the State of Alabama; (4) the State of Wisconsin; (5) the State of West Virginia; (6) the State of Tennessee; (7) Arizona Department of Education; (8) Heber-Overgaard Unified School District (Arizona); (9) Paul LePage, Governor of the State of Maine; (10) the State of Oklahoma; (11) the State of Louisiana; (12) the State of Utah; (13) the state of Georgia; (14) the State of Mississippi, by and through Governor Phil Bryant; (15) the Commonwealth of Kentucky, by and through Governor Matthew G. Bevin.

facilities which match their gender identity rather than their biological sex.[3]  Plaintiffs claim that

on May 13, 2016, Defendants wrote to schools across the country in a Dear Colleague Letter on

Transgender Students (the "DOJ/DOE Letter") and told them that they must "immediately allow

students to use the bathrooms, locker rooms and showers of the student's choosing, or risk losing

Title IX-linked funding."  Mot. Injunction 1, ECF No. 11.  Plaintiffs also allege Defendants have

asserted that employers who "refuse to permit employees to utilize the intimate areas of their

choice face legal liability under Title VII."  *Id.*  Plaintiffs complain that Defendants'

interpretation of the definition of "sex" in the various written directives (collectively "the

Guidelines")[4] as applied to Title IX of the Education Amendments of 1972 ("Title IX") and Title

VII of the Civil Rights Act of 1964 ("Title VII") is unlawful and has placed them in legal

jeopardy.

Plaintiffs contend that when Title IX was signed into law, neither Congress nor agency

regulators and third parties "believed that the law opened all bathrooms and other intimate

facilities to members of both sexes."  Mot. Injunction. 1, ECF No. 11.  Instead, they argue one of

Title IX's initial implementing regulations, 34 C.F.R. § 106.33 ("§ 106.33" or "Section 106.33"),

---

[3] Plaintiffs refer to a person's "biological sex" when discussing the differences between males and females, while Defendants refer to a person's sex based on the sex assigned to them at birth and reflected on their birth certificate *or* based on "gender identity" which is "an individual's internal sense of gender." *See* Am. Compl. 12, ECF No. 6; Mot. Injunction 1, ECF No. 11; Am. Compl. Ex. C (Holder Transgender Title VII Memo) ("Holder Memo 2014") App. 1 n.1, ECF No. 6-3 ("'[G]ender identity' [is defined] as an individual's internal senses of being male or female."); *Id.* at Ex. J. (DOJ/DOE Letter) 2, ECF No. 6-10. When referring to a transgendered person, Defendants' Guidelines state "transgender individuals are people with a gender identity that is different from the sex assigned to them at birth . . . ." Am. Compl., Ex. C (Holder Memo 2014), App. 1 n.1, ECF No. 6-3.  "For example, a transgender man may have been assigned female at birth and raised as a girl, but identify as a man."  *Id.* at Ex. D (OSHA Best Practices Guide to Restroom Access for Transgender Employees) ("OSHA Best Practice Guide"), App. 1, ECF No. 6-4.  The Court attempts to use the parties' descriptions throughout this Order for the sake of clarity.
[4] The Guidelines refer to the documents attached to Plaintiffs' Amended Complaint: (1) Ex. A (DOE Bullying Memo 2010), ECF No. 6-1; (2) Ex. B (DOE Questions and Answers on Title IX and Sexual Violence Memo) ("DOE Q&A Memo"), ECF No. 6-2; (3) Ex. C ("Holder Memo 2014"), ECF No. 6-3, (4) Ex. D (OSHA Best Practice Guide), ECF No. 6-4; (5) Ex. H (EEOC Fact Sheet), ECF No. 6-8; and (6) Ex. J (DOJ/DOE Dear Colleague Letter), ECF No. 6-10.

expressly authorized separate restrooms on the basis of sex. Section 106.33 provides: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. Plaintiffs assert the term sex in the pertinent statutes and regulations means the biological differences between a male and female. Mot. Injunction 2, ECF No. 11. Plaintiffs state that Defendants' swift move to supplant the traditional, biological meaning of sex with a definition based on gender identity through the Guidelines, coupled with Defendants' actions to enforce these new agency policies through investigations and compliance reviews, causes Plaintiffs to suffer irreparable harm for which a preliminary injunction is needed. *Id.* at 3–8; Pls.' Reply 3–7, ECF No. 54.

Defendants contend that the Guidelines and recent enforcement actions are designed to prohibit sex discrimination on the basis of gender identity and are "[c]onsistent with the nondiscrimination mandate of [Title IX]," and that "these guidance documents . . . are merely expressions of the agencies' views as to what the law requires." Defs.' Resp. 2–4, ECF No. 40. Defendants also contend that the Guidelines "are not legally binding, and they expose [P]laintiffs to no new liability or legal requirements" because DOE "has issued documents of this nature for decades, across multiple administrations, in order to notify schools and other recipients of federal funds about how the agency interprets the law and how it views new and emerging issues." *Id.* at 4–5.[5] Defendants also state that the "[g]uidance documents issued by [DOE] 'do not create or confer any rights for or on any person and do not impose any requirements beyond those required under applicable law and regulations'" and these documents expressly state that they do

---

[5] Defendants cited to U.S. Dep't of Educ., Office for Civil Rights, Sex Discrimination Policy Guidance, http://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/sex.html (last visited August 5, 2016) (discussing the purpose of guidance documents and providing links to guidance documents).

not carry the force of law. *Id.* at 5 (citing Holder Memo 2, ECF No. 6-10, to clarify that "the best reading of Title VII's prohibition of sex discrimination is that it encompasses discrimination based on gender identity, including transgender status," but the memo "is not intended to otherwise prescribe the course of litigation or defenses that should be raised in any particular employment discrimination case").

### A.    TITLE IX

Title IX, enacted in 1972, is the landmark legislation which prohibits discrimination among federal fund recipients by providing that no person "shall, on the basis of sex, . . . be subjected to discrimination under any educational program or activity receiving Federal financial assistance."  20 USC § 1681.  The legislative history shows Congress hailed Title IX as an indelible step forward for women's rights.  Mot. Injunction at 2–4.  After its passage, the DOE and its predecessor implemented a number of regulations which sought to enforce Title IX, chief among them, and at issue here, § 106.33.  *See G.G. ex rel Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 721 (4th Cir. 2016) (stating that the Department of Health, Education, and Welfare ("HEW") adopted its Title IX regulations in 1975 pursuant to 40 Fed. Reg. 24,128 (June 4, 1975), and DOE implemented its regulations in 1980 pursuant to 45 Fed. Reg. 30802, 30955 (May 9, 1980)).  Section 106.33, as well as several other related regulations, permit educational institutions to separate students on the basis of sex, provided the separate accommodations are comparable.

## II.    LEGAL STANDARDS

### A.    The Administrative Procedure Act (the "APA")

"The APA authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'"

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (quoting 5 U.S.C. § 702). "Where no

other statute provides a private right of action, the 'agency action' complained of must be *final*

agency action.'" *Id.* at 61–62 (quoting 5 U.S.C. § 704).[6]   In the Fifth Circuit, "final agency

action" is a jurisdictional threshold, not a merits inquiry. *Texas v. Equal Employment*

*Opportunity Comm'n*, No. 14-10949, 2016 WL 3524242 at *5 (5th Cir. June 27, 2016)

("*EEOC*"); s*ee also Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the*

*United States*, 362 F.3d 333, 336 (5th Cir. 2004) ("If there is no 'final agency action,' a federal

court lacks subject matter jurisdiction." (citing *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287

(5th Cir. 1999))).

An administrative action is "final agency action" under the APA if: (1) the agency's

action is the "consummation of the agency's decision making process;" and (2) "the action [is]

one by which 'rights or obligations have been determined,' or from which 'legal consequences

will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & Southern Air*

*Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); and *Port of Boston Marine*

*Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). "In evaluating

whether a challenged agency action meets these two conditions, this court is guided by the

Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'"

*EEOC*, 2016 WL 3524242, at *5; *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting

---

[6] Agency action is defined in 5 U.S.C. § 551(13) to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (quoting 5 U.S.C. § 551(13)). "All of those categories involve circumscribed, discrete agency actions, as their definitions make clear: 'an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy' (rule); 'a final disposition . . . in a matter other than rule making' (order); a 'permit . . . or other form of permission' (license); a 'prohibition . . . or . . . taking [of] other compulsory or restrictive action' (sanction); or a 'grant of money, assistance, license, authority,' etc., or 'recognition of a claim, right, immunity,' etc., or 'taking of other action on the application or petition of, and beneficial to, a person' (relief)." *Id.* (quoting § 551(4), (6), (8), (10), (11)).

*Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967)).   When final agency actions are presented for judicial review, the APA provides that reviewing courts should hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.   *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 150–151 (1991).

### B.   Preliminary Injunction

The Fifth Circuit set out the requirements for a preliminary injunction in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).   To prevail on a preliminary injunction, the movant must show: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest.   *Id.*; *see also Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

To qualify for a preliminary injunction, the movant must clearly carry the burden of persuasion with respect to all four requirements.   *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).   If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001).   A movant who obtains a preliminary injunction must post a bond to secure the non-movant against any wrongful damages it suffers as a result of the injunction.   Fed. R. Civ. P. 65(c).

The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court.   *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621

(5th Cir. 1985) (citing *Canal*, 489 F.2d at 572).  A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion."  *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).  Even when a movant satisfies each of the four *Canal* factors, the decision whether to grant or deny a preliminary injunction remains discretionary with the district court.  *Miss. Power & Light Co.*, 760 F.2d at 621.  The decision to grant a preliminary injunction is to be treated as the exception rather than the rule.  *Id.*

## III.   ANALYSIS

Plaintiffs argue that: (1) Defendants skirted the notice and comment process—a necessity for legislative rules; (2) the new mandates are incompatible with Title VII and Title IX and the agencies are not entitled to deference; (3) the mandates violate the clear notice and anti-coercion requirements which the federal government may attach to spending programs; and (4) nationwide relief is necessary to prevent the irreparable harm Defendants will cause Plaintiffs.  Mot. Injunction 2–3, ECF No. 11.

Defendants assert that Plaintiffs are not entitled to a preliminary injunction because: (1) Plaintiffs do not have standing to bring their claims; (2) this matter is not ripe for review; (3) Defendants' Guidelines do not violate the APA; (4) Plaintiffs cannot demonstrate irreparable harm and they have an alternative remedy; (5) Defendants did not violate the Spending Clause; (6) and an injunction would harm Defendants and third parties.  Defs.' Resp. 1–3, ECF No. 40.  Defendants allege that should an injunction be granted, it should be implemented only to

Plaintiffs in the Fifth Circuit. *Id.* The Court addresses these issues, beginning with Defendants' jurisdictional arguments.[7]

### A.   Jurisdiction

#### 1.   Standing

Defendants allege that "[P]laintiffs' suit fails the jurisdictional requirements of standing and ripeness . . . because they have not alleged a cognizable concrete or imminent injury." Defs.' Resp. 12, ECF No. 40 (citing *Lopez v. City of Hous.*, 617 F.3d 336, 342 (5th Cir. 2015)). Defendants allege "a plaintiff must demonstrate that it has 'suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Defendants contend that "[t]he agencies have merely set forth their views as to what the law requires" regarding whether gender identity is included in the definition of sex, and "[a]t this stage, [P]laintiffs have alleged no more than an abstract disagreement with the agencies' interpretation of the law," since "[n]o concrete situation has emerged that would permit the Court to evaluate [P]laintiffs' claims in terms of specific facts rather than abstract principles." *Id.* at 13–14.

Defendants also allege that Plaintiffs "have [not] identified any enforcement action to which they are or are about to be subject in which a defendant agency is seeking to enforce its

---

[7] The parties have requested that the Court provide expedited consideration of the preliminary injunction. The briefing on this request was completed on August 3, 2016, and the matter was not ripe until after the hearing was completed on August 12, 2016. Because further legal issues concerning the basis for Plaintiffs' Spending Clause claim were raised at the hearing and require further briefing, the Court will not await that briefing at this time. *See* Hr'g Tr. 35, 44, 52–53 (discussing new program requirements and whether a new program is the same as annual grants). Therefore, the Spending Clause issue is not addressed in this Order. *See* ECF Nos. 11–12. Finally, where referenced, Title VII is used to help explain the legislative intent and purpose of Title IX because the two statutes are commonly linked. *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 546 (1982).

view of the law. As such, any injury alleged by plaintiffs is entirely speculative, as it depended

on the initiation of some kind of enforcement action . . . which may never occur." Defs.' Resp.

14, ECF No. 40.

Plaintiffs state that Defendants are affirmatively using the Guidelines to force compliance

as evidenced by various resolution agreements reached in enforcement cases across the country

and from the litigation against the state of North Carolina, all of which is designed to force

Plaintiffs to amend their policies to comply or place their federal funding in jeopardy.  Hr'g Tr.

at 78.  Plaintiffs argue they are clearly the object of the Defendants' Guidelines, and those

directives run afoul of various state constitutional and statutory codes which permit Plaintiffs to

exercise control of their education premises and facilities.[8]  Hr'g Tr. at 77.  Plaintiffs contend all

---

[8] Plaintiffs' motion provides the following citations to their state laws which give them legal control over
the management of the safety and security policies of educational buildings in their states and which the
Guidelines will compel them to disregard.  Texas cites to Tex. Const. art 7 § 1 ("[I]t shall be the duty of
the Legislature of the State to establish and make suitable provision for the support and maintenance of an
efficient system of public free schools."); Tex. Educ. Code §§ 4.001(b) (stating the objectives of public
education, including Objective 8: "School campuses will maintain a safe and disciplined environment
conducive to student learning."); 11.051 ("An independent school district is governed by a board of
trustees who, as a corporate body, shall: (1) oversee the management of the district; and (2) ensure the
superintendent implements and monitors plans, procedures, programs, and systems to achieve
appropriate, clearly defined, and desired results in the major areas of district operations."); 11.201 (listing
the duties of the superintendent including "assuming administrative responsibility and leadership for
planning, organization, operation, supervision, and evaluation of the education programs, services, and
facilities of the district . . . ."); and 46.008 ("The commissioner shall establish standards for adequacy of
school facilities. The standards must include requirements related to space, educational adequacy, and
construction quality."); Pls.' Reply Ex. (Belew Decl.) 4, ECF No. 52-1 (stating the Texas Education
Agency ("TEA") is responsible for "[t]he regulation and administration of physical buildings and
facilities within Texas public schools" among other duties).  Plaintiffs also provided an exhaustive list of
similar state constitution citations, statutes, codes, and regulations that grant each Plaintiff the power to
control the regulations that govern the administration of public education and public education facilities.
*See* Mot. Injunction 9–11 n. 9-22, ECF No. 11 (quoting Ala. Code §§ 16-3-11, 16-3-12, 16-8-8–16-8-12
("Alabama law authorizes state, county, and city boards of education to control school buildings and
property."); Wis. stat. chs. 115, 118 ("In Wisconsin, local school boards and officials govern public
school operations and facilities . . . with the Legislature providing additional supervisory powers to a
Department of Public Instruction."); Wis. Stat. § 120.12(1) ("School boards and local officials are vested
with the 'possession, care, control and management of the property and affairs of the school district, and
must regulate the use of school property and facilities."); Wis. Stat. § 120.13(17) ("Wisconsin law also
requires school boards to '[p]rovide and maintain enough suitable and separate toilets and other sanitary

of this confers standing according to the Fifth Circuit's opinion in *Texas v. Equal Employment Opportunity Commission*, No. 14-10940, 2016 WL 3524242 (5th Cir. June 27, 2016).  Hr'g Tr. 78.

Defendants counter that *EEOC* was wrongly decided and, regardless, the facts here are distinguishable from that case.[9]  *Id.*  Defendants primarily distinguish *EEOC* from this case based on the *EEOC* majority's view that the "guidance [at issue] contained a 'safe harbor' [provision]" and "the [guidance at issue had] the immediate effect of altering the rights and obligations of the 'regulated community' . . . by offering them [] detailed and conclusive means

---

facilities for both sexes.'"); W. Va. Const. art. XII, § 2; W. Va. code § 18-5-1, 18-5-9(4) ("West Virginia law establishes state and local boards of education . . . and charges the latter to ensure the good order of the school grounds, buildings, and equipment."); Tenn. Code Ann. §§ 49-12, 1-302, 49-1-201 ("In Tennessee, the state board of education sets statewide academic policies, . . . and the department of education is responsible for implementing those polices[, while] [e]ach local board of education has the duty to "[m]anage and control all public schools established or that may be established under its jurisdiction."); Tenn. Code Ann. §§ 49-1-201(a)-(c)(5), 49-2-203(a)(2) ("The State Board is also responsible for "implementation of law" established by the General Assembly, . . . and ensuring that the 'regulations of the state board of education are faithfully executed.'"); Ariz. Rev. Stat. §§ 15-203(A)(1), 15-341(A)(1), 15-341(A)(3) ("Arizona law establishes state and local boards of education, . . . and empowers local school districts to '[m]anage and control the school property within its district.'"); Me. Rev. Stat. tit. 20-A, §§ 201–406, 1001(2), 6501 ("Maine provides for state and local control over public education. While state education authorities supervise the public education system, control over management of all school property, including care of school buildings[,] . . . [a]nd Maine law provides requirements related to school restrooms."); Okla. Const. art. XIII, §§ 5, 5-117 ("Oklahoma law establishes a state board of education to supervise public schools. Local school boards are authorized by the board to operate and maintain school facilities and buildings."); La. Const. art VIII, § 3, LSA-R. Stat. § 17:100.6 ("In Louisiana, a state board of education oversees public schools, . . .while local school boards are charged with the management, administration, and control of buildings and facilities within their jurisdiction."); Utah Code §§ 53A-1-101, 53A-3-402(3) ("Utah law provides for state and local board of educations, . . . and authorizes the local boards to exercise control over school buildings and facilities."); Ga. Code § 20-2-59, 520 ("Georgia places public schools under the control of a board of education, . . . and delegates control over local schools, including the management of school property, to county school boards govern local schools."); Miss. Code Ann. § 37-7-301 ("In Mississippi, the state board of education oversees local school boards, which exercise control over local school property."); Ky. Rev. Stat. §§ 156.070, 160.290 ("In Kentucky, the state board of education governs the state's public school system, . . . while local boards of education control "*all* public school property" within their jurisdictions, . . and can make and adopt rules applicable to such property.").

[9] *Id.* at 14 ("[T]he government respectfully disagrees with that decision for many of the reasons stated in Judge Higginbotham's dissenting opinion, and . . . EEOC is distinguishable from this case in important respects."); Hr'g Tr. 53 ("Let me say at the outset . . . the Government disagrees with that decision.").

to avoid an adverse EEOC finding."   Defs.' Resp. 15, ECF No. 40.   Defendants claim that the same kind of facts are not present here.   Defendants contend further that "the [transgender] guidance documents do not provide 'an exhaustive procedural framework,' [or] . . . a safe harbor, but merely express[] the agencies' opinion about the proper interpretation of Title VII and Title IX."   *Id.*   Thus, they argue, the Court lacks jurisdiction and should decline to enter a preliminary injunction.   *Id.*[10]

The Court finds that Plaintiffs have standing.   "The doctrine of standing asks 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'"   *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)).   Constitutional standing requires a plaintiff to establish that she has suffered an injury in fact traceable to the defendant's actions that will be redressed by a favorable ruling.   *Lujan*, 504 U.S. at 560–61.   The injury in fact must be "concrete and particularized" and "actual or imminent," as opposed to "conjectural" or "hypothetical."   *Id.* at 560.   When "a plaintiff can establish that it is an 'object' of the agency regulation at issue, 'there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it.'"   *EEOC*, 2016 WL 3524242 at *2; *Lujan*, 504 U.S. at 561–62.   The Fifth Circuit provided, "[w]hether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense."   *Id.* at *6 (quoting *Contender Farms LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 265 (5th Cir. 2015)).

In *EEOC*, Texas sued the EEOC over employment guidance the EEOC issued to employers concerning their Title VII obligations.   In response, the EEOC argued Texas lacked standing because the guidance was advisory only and imposed no affirmative obligation.   The

---

[10] The Court addresses Defendants' claim that Plaintiffs have an adequate alternate remedy in Section III.A.4.

Fifth Circuit held that Texas had standing to seek relief because it was an object of the EEOC's guidance as the guidance applied to Texas as an employer. *Id*. at *4.

This case is analogous. Defendants' Guidelines are clearly designed to target Plaintiffs' conduct. At the hearing, Defendants conceded that using the definition in the Guidelines means Plaintiffs are not in compliance with their Title VII and Title IX obligations. Hr'g Tr. 74. Defendants argue that that this does not confer standing because the Guidelines are advisory only. Defs.' Resp. 14, ECF No. 40. But this conflates standing with final agency action and the Fifth Circuit instructed district courts to address the two concepts separately. *See EEOC*, 2016 WL 3524242 at *3. Defendants' Guidelines direct Plaintiffs to alter their policies concerning students' access to single sex toilet, locker room, and shower facilities, forcing them to redefine who may enter apart from traditional biological considerations.[11] Plaintiffs' counsel argued the Guidelines will force Plaintiffs to consider ways to build or reconstruct restrooms, and how to accommodate students who may seek to use private single person facilities, as other school districts and employers who have been subjected to Defendants' enforcement actions have had to do. Hr'g Tr. 80–81. That the Guidelines spur this added regulatory compliance analysis satisfies the injury in fact requirement. *EEOC*, 2016 WL 3524242 at *4 ("[T]he guidance does, at the very least, force Texas to undergo an analysis, agency by agency, regarding whether the certainty of EEOC investigations . . . overrides the State's interest . . . . [T]hese injuries are sufficient to confer constitutional standing, especially when considering Texas's unique position as a sovereign state . . . ."). That Plaintiffs have standing is strengthened by the fact that Texas and

---

[11] For example, Plaintiffs list Wisconsin's state statutes regarding this matter, which state that school boards are required to "[p]rovide and maintain enough suitable and separate toilets and other sanitary facilities for both sexes." Mot. Injunction 10 n.9, ECF No. 11 (citing Wis. Stat. s. 120.12(12)). Plaintiffs interpret this to mean that Wisconsin has the authority to maintain separate intimate facilities that correspond to a person's biological sex. *Id.*

other Plaintiffs have a "stake in protecting [their] quasi-sovereign interests . . . [as] special solicitude[s]." *Mass. v. E.P.A.*, 549 U.S. 497, 520 (2007) ("Congress has moreover recognized a concomitant procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious. § 7607(b)(1).  Given that procedural right and Massachusetts' stake in protecting its quasi-sovereign interests, the Commonwealth is entitled to special solicitude in our standing analysis.").

Accordingly, Plaintiffs have standing to pursue this lawsuit.

2.  Ripeness

Defendants also argue that this case is not ripe for review.  According to Defendants, this Court should avoid premature adjudication to avoid entangling itself in abstract disagreements over administrative policies.  Defs.' Resp. 13, ECF No. 40 (citing *Nat'l Park Hosp. Ass'n v. Dep.'t Interior*, 538 U.S. 803, 807 (2003)).  Defendants argue that more time should be given to allow the administrative process to run its course and develop more facts before the Court can address this case.  *Id.* at 13 (citing *Abbott Labs*, 387 U.S. 136, 149 (1967)); Hr'g Tr. 62.  Plaintiffs counter that, taking into account recent events where Defendants have investigated other entities that do not comply with the Guidelines, this case is ripe.  Pls.' Reply 4–7, ECF No. 52; Hr'g Tr. 79.

"A challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'"  *Texas v. United States*, 497 F.3d 491, 498–99 (5th Cir. 2007) (citing *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812).

14

The Court finds that Plaintiffs' case is ripe for review. Here, the parties agree that the questions at issue are purely legal. Hr'g Tr. 61. Defendants asserted at the hearing that Plaintiffs are not in compliance with their obligations under Title IX given their refusal to change their policies. Hr'g Tr. 74. Furthermore, for the reasons set out below, the Court finds that Defendants' actions amount to final agency action under the APA.[12] *EEOC*, 2016 WL 3524242 at *11 n.9 ("Having determined that the Guidance is 'final agency action' under the APA, it follows naturally that Texas's APA claim is ripe for review. Texas's challenge to the EEOC Guidance is a purely legal one, and as such it is unnecessary to wait for further factual development before rendering a decision.") (Internal citations omitted).

Finally, the facts of this case have sufficiently developed to address the legal impact Defendants' Guidelines have on Plaintiffs' legal questions in this case. *Texas*, 497 F.3d at 498–99. The only other factual development that may occur, given Defendants' conclusion Plaintiffs are not in legal compliance, is whether Defendants actually seek to take action against Plaintiffs. But it is not clear how waiting for Defendants to actually take action would "significantly advance [the court's] ability to deal with the legal issues presented." *Texas*, 497 F.3d at 498–99. As previously stated, Defendants' Guidelines clash with Plaintiffs' state laws and policies in relation to public school facilities and Plaintiffs have called into question the legality of those Guidelines. Mot. Injunction 9–12, ECF No. 11. Therefore, "further factual development would not 'significantly advance the courts ability to deal with the legal issues presented.'" *Texas*, 497 F.3d at 498−99. Accordingly, the Court finds that this case is ripe for review.

3.      Final Agency Action under the APA

---

[12] The Court further addresses this issue in section III.A.3.

The Court now evaluates whether the Guidelines are final agency action meeting the jurisdictional threshold under the APA. *EEOC*, 2016 WL 3524242 at *5. Defendants argue that there has been no final agency action as the documents in question are merely "paradigmatic interpretive rules, exempt from the notice-and-comment requirements of the APA." Defs.' Resp. 18, ECF No. 40. Defendants also allege that the Guidelines are "[v]alid interpretations of the statutory and regulatory authorities on which they are premised" because although Title IX and § 106.33 provide that federal recipients may provide for separate, comparable facilities, the regulation and statute "do not address how they apply when a transgender student seeks to use those facilities . . . ." *Id.* at 20−21.

Plaintiffs allege that the agencies' Guidelines are binding nationwide and the Defendants' enforcement patterns in various states clearly demonstrate that legal actions against those that do not comply will follow. Mot. Injunction 9–12, ECF No. 11; Reply 2–8, ECF No. 52. Plaintiffs identify a number of similar cases where Defendants have investigated schools that refused to comply with the new Guidelines and where they sued North Carolina over its state law which, in part, made it legal to require a person to use the public restroom according to their biological sex. Reply 6, ECF No. 52.

An administrative action is "final agency action" under the APA if: (1) the agency's action is the "consummation of the agency's decision making process;" and (2) "the action [is] one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177–78. "In evaluating whether a challenged agency action meets these two conditions, the court is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'" *EEOC*, 2016 WL 3524242 at *5 (quoting *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011)).

16

The Court finds that the Guidelines are final agency action under the APA.  Defendants do not dispute that the Guidelines are a "consummation" of the agencies' decision-making process.  Hr'g Tr. 61; *Nat'l Pork Producers Council v. E.P.A.*, 635 F.3d 738, 755–56 (5th Cir. 2011) (citing *Her Majesty the Queen in Right of Ontario v. Envtl. Prot. Agency*, 912 F.2d 1525, 1532 (D.C. Cir. 1990) (deciding that EPA guidance letters constitute final agency actions as they "serve[d] to confirm a definitive position that has a direct and immediate impact on the parties . . . .")).

The second consideration is also satisfied in this case because legal consequences flow from the Defendants' actions.  Defendants argue no legal consequences flow to Plaintiffs because there has been no enforcement action, or threat of enforcement action.  Hr'g Tr. 71.  The Fifth Circuit held in *EEOC* however that "an agency action can create legal consequences even when the action, in itself, is disassociated with the filing of an enforcement proceeding, and is not authority for the imposition of civil or criminal penalties."  2016 WL 3524242 at *8. According to the Fifth Circuit, "'legal consequences' are created whenever the challenged agency action has the effect of committing the agency itself to a view of the law that, in turn, forces the plaintiff either to alter its conduct, or expose itself to potential liability."  *Id.* (citing *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1814–15 (May 31, 2016) (holding that using the pragmatic approach, an agency action asserting that plaintiff's land was subject to the Clean Water Act's permitting process was a final agency action which carried legal consequences).  The Fifth Circuit concluded that "[i]t is also sufficient that the Enforcement Guidance [at issue in *EEOC*] has the immediate effect of altering the rights and obligations of the 'regulated community' (i.e. virtually all state and private employers) by offering them a detailed and conclusive means to avoid an adverse EEOC finding . . . ."  2016 WL 3524242 at * 6.

17

In this case, although the Guidelines provide no safe harbor provision, the DOJ/DOE Letter provides not only must Plaintiffs permit individuals to use the restrooms, locker rooms, showers, and housing consistent with their gender identity, but that they find *no* safe harbor in providing transgender students individual-user facilities as an alternative accommodation. Indeed, the Guidelines provide that schools may, consistent with Title IX, make individual-user facilitates available for *other* students who "voluntarily seek additional privacy."  *See* DOJ/DOE Letter 3, ECF No. 6-10.   Using a pragmatic and common sense approach, Defendants' Guidelines and actions indicate that Plaintiffs jeopardize their federal education funding by choosing not to comply with Defendants' Guidelines.[13]   *EEOC*, 2016 WL 3524242 at *8 ("Instead, 'legal consequences' are created whenever the challenged agency action has the effect of committing the agency itself to a view of the law that, in turn, forces the plaintiff either to alter its conduct, or expose itself to potential liability."); *Resident Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.*, 980 F.2d 1043, 1056–57 (5th Cir. 1993) (stating that "[w]ere HUD to formally define the phrase [at issue] . . . [the plaintiffs] would undoubtedly have the right to review HUD's final agency action under § 702 [of the APA]"); *Frozen Foods Express v. United States*, 351 U.S. 40, 44–45 (1956) (holding an order specifying which commodities the Interstate Commerce Commission believed were exempt was final agency action, even though the order simply gave notice of how it would interpret the statute and would apply only when an action was brought): *compare with AT&T Co. v. E.E.O.C*, 27 F.3d 973, 975–76 (D.C. Cir. 2001) (holding that the EEOC's compliance manual was not a final agency action because the policy guidance did not intend to bind EEOC staff in their official conduct, the

---

[13] The Holder Memorandum concludes, "For these reasons, the [DOJ] will no longer assert that Title VII's prohibition of discrimination based on sex does not encompass gender identity *per se* (including transgender discrimination)."  Holder Memo 2, ECF No. 6-3.  Other guidance from Defendants take similar actions.  *See also* DOJ/DOE Letter 4–5, ECF No. 6-10.

manual simply expressed the agency's view with respect to employers' actions and compliance with Title VII).

Accordingly, the Court finds that Defendants' Guidelines are final agency action such that the jurisdictional threshold is met. *EEOC*, 2016 WL 3524242 at *5.

### 4.   Alternative Legal Remedy

Defendants also contend that district court review is precluded and Plaintiffs should not be allowed to avoid the administrative process by utilizing the APA at this time. Defs.' Resp. 16, ECF No. 40. Defendants allege that "review by a court of appeals is an 'adequate remedy' within the meaning of the APA," and "[s]ection 704 of the APA thus prevents plaintiffs from circumventing the administrative and judicial process Congress provided them." *Id.* Defendants argue "Congress has precluded district court jurisdiction over pre-enforcement actions like this." *Id.* at 17. Defendants cite several cases, including the Supreme Court's opinions in *Thunder Basin v. Reich*, 510 U.S. 200 (1994) and *Elgin v. Department of Treasury*, 132 S.Ct. 2126 (2012), in support of this argument.[14]

Defendants' assertion that there is no jurisdiction to review Plaintiffs' APA claims fails and their reliance on *Thunder Basin*, *Elgin*, and the other cited cases is misplaced. In *Thunder Basin*, the Supreme Court held that the Mine Act's statutory review scheme precluded the district

---

[14] Defendants also assert *NAACP v. Meese* supports this argument but the Court disagrees. In that case, the plaintiffs sought to enjoin the Attorney General from reopening or agreeing to reopen any consent decree in any civil rights action pending in any other court. The district court denied this request, holding such actions would violate principles of separation of powers and comity. 615 F. Supp. 200, 201–02 (D.D.C. 1985) ("Plaintiffs' action must fail (1) under the principle of the separation of powers, and (2) because this Court lacks authority to interfere with or to seek to guide litigation in other district courts throughout the United States."). The *Meese* court also concluded there was no final agency action to enjoin and, by definition, there would be an alternative legal remedy related to those cases where a consent decree existed because those decrees were already subject to a presiding judge. *Id.* at 203 n.9. Additionally, Defendants reliance on *Dist. Adult Prob. Dep't v. Dole*, 948 F.2d 953 (5th Cir. 1991) does not apply because there was no final agency action in that case.

court from exercising subject-matter jurisdiction over a pre-enforcement challenge. To determine whether pre-enforcement challenges are prohibited courts look to whether this "intent is 'fairly discernible in the statutory scheme.'" *Thunder Basin*, 510 U.S. at 207 (quoting *Block v. Community Nutrition Institute*, 467 U.S. 340, 351 (1984)). The Supreme Court held that "[w]hether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history . . . and whether the claims can be afforded meaningful review." *Id.* (internal citation omitted).

Although the Mine Act was silent about pre-enforcement claims, the Supreme Court held that "its comprehensive enforcement structure demonstrate[d] that Congress intended to preclude challenges," and the Mine Act "expressly authorize[d] district court jurisdiction in only two provisions . . . [which allowed] the Secretary [of Labor] to enjoin [] violations of health and safety standards and to coerce payment of civil penalties." *Id.* at 209. Thus, plaintiffs had to "complain to the Commission and then to the court of appeals." *Id.* (italics omitted).

*Elgin* reached a similar conclusion, holding that the Civil Service Reform Act ("CSRA") was the exclusive avenue to judicial review for petitioners' claims against the Treasury Department. 132 S. Ct. 2126, 2128 ("Just as the CSRA's 'elaborate' framework [citation omitted] demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review, it similarly indicates that extrastatutory review is not available to those employees to whom the CSRA *grants* administrative and judicial review.").

No similar elaborate statutory framework exists covering Plaintiffs' claims. Neither Title VII nor Title IX presents statutory schemes that would preclude Plaintiffs from bringing these claims in federal district court. Indeed, the Supreme Court has held that Title IX's enforcement provisions, codified at Title 20 U.S.C. §§ 1681–1683, does not provide the exclusive statutory

remedy for violations.  *See Cannon v. Univ. of* Chicago, 441 U.S. 677 (1979) (holding that Title

IX did not preclude a private right of action for damages).  Given Defendants lack of authority to

the contrary, the presumption of reviewability for all agency actions applies.  *EEOC*, 2016 WL

3524242 at \*11 (citing *Abbott Labs.*, 387 U.S. at 140) ("To wholly deny judicial review,

however, would be to ignore the presumption of reviewability, and to disregard the Supreme

Court's instruction that courts should adopt a pragmatic approach for the purposes of

determining reviewability under the APA.").

Having concluded that Plaintiffs claims are properly subject to judicial review, the Court

next evaluates whether a preliminary injunction is appropriate.

### B.      Preliminary Injunction

#### 1.      Likelihood of Success on the Merits

The first consideration is whether Plaintiffs have shown a likelihood of success on the

merits for their claims.  Plaintiffs aver that they have shown a substantial likelihood that they

will prevail on the merits because Defendants have violated the APA by (1) circumventing the

notice and comment process and (2) by issuing final agency action that is contrary to law.  Mot.

Injunction 12–16, ECF No. 11.  Furthermore, Plaintiffs contend that Defendants' new policies

are not valid agency interpretations that should be granted deference because "[a]gencies do not

receive deference where a new interpretation conflicts with a prior interpretation."  Pls.' Reply

11, ECF No. 52 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)).

Defendants contend that their actions do not violate the APA because the Guidelines are

interpretive rules and are therefore exempt from the notice and comment requirements.  Defs.'

Resp. 12–18, ECF No. 40.  Defendants argue the Guidelines are exempt because they do not

carry the force of law, even though "the agencies' interpretations of the law are entitled to some

deference." Further, they argue because their interpretation is reasonable, this interpretation is entitled to deference.[15]   Defendants also assert they did not act contrary to law because the Guidelines are valid interpretations of Title IX as the statute and regulations "do not address how [the laws] apply when a transgender student seeks to use those facilities" or "how a school should determine a transgender student's sex when providing access to sex-segregated facilities." *Id.* at 20–21.   Thus, according to Defendants, this situation presents an ambiguity in the regulatory scheme and Defendants are allowed to provide guidelines to federal fund recipients on this matter.  *Id.* at 21.[16]

In their Reply, Plaintiffs counter that DOE's implementing regulation, § 106.33, is not "ambiguous[,] [a]s a physiologically-grounded regulation, it covers every human being and therefor all those within the reach of Title IX."  Reply 8, ECF No. 52.  They contend further, "[t]o create legal room to undo what Congress (and preceding regulators) had done, Defendants

---

[15] Defendants argue the Court should be guided in this decision by the Fourth Circuit's decision in *G.G. ex rel Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016) ("*G.G.*").  Defendants contend the Fourth Circuit's majority opinion in *G.G.* should be followed as it provides the proper analysis.  The Supreme Court recalled the Fourth Circuit's mandate and stayed the preliminary injunction entered by the district court in that case.  *See Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*, No. 16-A-52, 2016 WL 4131636 at *1 (Aug. 3, 2016) (Breyer, J. concurring) ("In light of the facts that four Justices have voted to grant the application referred to the Court by THE CHIEF JUSTICE, that we are currently in recess, and that granting a stay will preserve the status quo (as of the time the Court of Appeals made its decision) until the Court considers the forthcoming petition for certiorari, I vote to grant the application as a courtesy.").  The Supreme Court takes such actions only on the rarest of occasions.  *Bd. of Ed. of City School Dist. of City of New Rochelle v. Taylor*, 82 S.Ct. 10, 10 (1961) ("On such an application, since the Court of Appeals refused the stay '* * * this court requires an extraordinary showing, before it will grant a stay of the decree below pending the application for a certiorari."); *Russo v. Byrne*, 409 U.S. 1219, 1221 (1972) ("If the application presents frivolous questions it should be denied. If it tenders a ruling out of harmony with our prior decisions, or questions of transcending public importance, or issues which would likely induce this Court to grant certiorari, the stay should be granted.").  Because it is impossible to know the precise issue (s) that prompted the Supreme Court to grant the stay, it is difficult to conclude that *G.G.* would control the outcome here.  *See New Motor Vehicle Bd. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) (declaring it is very difficult to predict anticipated Supreme Court decision).  Nevertheless, the Court has reviewed the opinion and considers the well-expressed views of each member of the panel in reaching the decision in this case.

[16] Defendants characterize their Guidelines as, "supply[ing] 'crisper and more detailed lines' than the statutes and regulations that they interpret," without "alter[ing] the legal obligations of regulated entities." *Id.* at 20 (citing *Am. Mining Cong. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)).

manufacture an ambiguity, claiming that 'these regulations do not address how they apply when a transgender student seeks to use those facilities . . . .'" *Id.* (citing Defs.' Response 20–21, ECF No. 40). Plaintiffs continue, "[i]n enacting Title IX, Congress was concerned that women receive the same opportunities as men, [t]hus, Congress utilized 'sex' in an exclusively biological context[,] [and] "[t]he two sexes are not fungible." *Id.* at 8–9 (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946). It is the biological differences between men and women, Plaintiffs allege, that led Congress in 1972 to "permit differential treatment by sex only[,]" provide a basis for DOE "to approve 'separate toilet, locker rooms, and shower facilities on the basis of sex" in § 106.33, and led the Supreme Court "to conclude that educational institutions must 'afford members of each sex privacy from the other sex.'" *Id.* at 9 (quoting 118 Cong. Rec. 5807 (1972)); *United States v. Virginia*, 518 U.S., 550 n.19 (1996)).

The Court finds that Plaintiffs have shown a likelihood of success on the merits because: (1) Defendants bypassed the notice and comment process required by the APA; (2) Title IX and § 106.33's text is not ambiguous; and (3) Defendants are not entitled to agency deference under *Auer v. Robbins*, 519 U.S. 452 (1997).[17]

i.       *Notice and Comment under the APA*

Defendants state that "[t]he APA does not require agencies to follow notice and comment procedures in all situations [, and the APA] specifically excludes interpretive rules and statements of agency policy from these procedures." Defs.' Resp. 17–18, ECF No. 40. Defendants allege "[t]he guidance documents are . . . paradigmatic interpretive rules, exempt from the notice-and-comment requirements of the APA." *Id.* at 18. According to Defendants,

---

[17] Defendants' counsel stated at the hearing that Defendants would not be entitled to *Chevron* deference for the Guidelines. *See* Hr'g Tr. 72. Thus, the Court addresses only Defendants' claim that they are entitled to *Auer* deference when interpreting § 106.33.

"the interpretations themselves do not carry the force of law . . . ." *Id.* at 19.  Defendants rely on *G.G.*, 822 F.3d 709, 720 (4th Cir. 2016) to support their claim that DOE's "interpretation of the single-sex facility regulation implementing Title IX is reasonable, and does not conflict with those regulations in any way." *Id.*

Plaintiffs contend that Defendants' rules are legislative because: "(1) they grant rights while also imposing significant obligations; (2) they amend prior legislative rules or longstanding agency practice; and (3) bind the agencies and regulated entities," requiring them to go through the notice and comment process.  Mot. Injunction 12, ECF No. 11.

The APA requires agency rules to be published in the Federal Register and that the public be given an opportunity to comment on them.  5 U.S.C. §§ 553(b) −(c).  This is referred to as the notice and comment requirement.  The purpose is to permit the agency to understand and perhaps adjust its rules based on the comments of affected individuals.  *Prof'ls and Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir.1995).  However, not every action an agency takes is required to go through the notice and comment process.  "The APA divides agency action, as relevant here, into three boxes: legislative rules, interpretive rules, and general statements of policy."  *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).  "Legislative rules generally require notice and comment, but interpretive rules and general statements of policy do not."  *Id.* (citing 5 U.S.C. § 553).  "In order for a regulation to have the 'force and effect of law,' it must have certain substantive characteristics and be the product of certain procedural requisites."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 301–03, (1979).

The APA does not define a legislative or "substantive" rule, but in *Morton v. Ruiz*, 415 U.S. 199, 234 (1974), the Supreme Court held that a substantive rule or "a legislative-type rule," is one that "affect[s] individual rights and obligations."  *Id.* at 232.  The Supreme Court also

held, "the promulgation of these regulations must conform with any procedural requirements imposed by Congress." *Chrysler Corp.*, 441 U.S. at 303.  Thus, agency discretion is limited not only by substantive, statutory grants of authority, but also by the procedural requirements which "assure fairness and mature consideration of rules of general application." *Id.* (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759 (1969)).  If a rule is substantive, notice and comment requirements must be adhered to scrupulously.  *Prof'ls and Patients for Customized Care*, 56 F.3d at 595.

"[L]egislative rules (and sometimes interpretive rules) may be subject to pre-enforcement review" because they subject a party to a binding obligation which can be the subject of an enforcement action.  *McCarthy*, 758 F.3d at 251. ("An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule . . . .").  The APA treats interpretive rules and general statements of policy differently.  *Id.*  ("As to interpretive rules, an agency action that merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties, is an interpretive rule.").[18]

Courts have focused on several factors to evaluate whether rules are interpretative or legislative.  Courts analyze the agency's characterization of the guidance and post-guidance events to determine whether the agency has applied the guidance as if it were binding on regulated parties.  *McCarthy*, 758 F.3d at 252−53.  However, "the most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated

---

[18] *Catawba Cty.* provides: "An agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy.")

entities." *McCarthy*, 758 F.3d at 252 (quoting *Catawba Cty. v. EPA*, 571 F.3d 20, 33–34; *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002)).   "A touchstone of a substantive rule is that it establishes a binding norm." *Prof'ls and Patients for Customized Care*, 56 F.3d at 596; *see also Texas v. United States*, 809 F.3d 134, 202 (5th Cir. 2015) (King, J., dissenting) (declaring that an agency action establishing binding norms which permit no discretion is a substantive rule requiring notice and comment).   If agency action "draws a 'line in the sand' that, once crossed, removes all discretion from the agency" the rule is substantive.   *Id.* at 601.

Here, the Court finds that Defendants rules are legislative and substantive.   Although Defendants have characterized the Guidelines as interpretive, post-guidance events and their actual legal effect prove that they are "compulsory in nature."   *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000);[19] *see also Prof'ls and Patients for Customized Care*, 56 F.3d at 596 (the label an agency places on its exercise of administrative power is not conclusive, rather it is what the agency does with that policy that determines the type of action). Defendants confirmed at the hearing that schools not acting in conformity with Defendants' Guidelines are not in compliance with Title IX.   Hr'g Tr. 71.   Further, post-Guidelines events, where Defendants have moved to enforce the Guidelines as binding, buttress this conclusion.   *Id.* at 7; Mot. Injunction 15–16, ECF No. 11; Reply 4–8, ECF No. 52.   The information before the Court demonstrates Defendants have "drawn a line in the sand" in that they have concluded Plaintiffs must abide by the Guidelines, without exception, or they are in breach of their Title IX obligations.   Thus, it would follow that the "actual legal effect" of the Guidelines is to force

---

[19] In *Appalachian Power*, the D.C. Circuit held that an EPA guidance was a legislative rule despite the guidance document's statement that it was advisory.   The Court analyzed the document as a whole and found that "the entire Guidance, from beginning to end—except the last paragraph—reads like a ukase. It commands, it requires, it orders, it dictates."   208 F.3d at 1022-23.   Similarly, the DOJ/DOE Letter uses the words "must," and various forms of the word "require" numerous times throughout the document. Am. Compl. Ex. J (DOJ/DOE Letter), ECF No. 6-10.

Plaintiffs to risk the consequences of noncompliance.  *McCarthy*, 758 F.3d at 252; *Catawba Cty.*, 571 F.3d at 33–34; *Gen. Elec. Co.*, 290 F.3d at 382; *see also Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005).  Plaintiffs, therefore, are legally affected in a way they were not before Defendants issued the Guidelines.  The Guidelines are, in practice, legislative rules—not just interpretations or policy statements because they set clear legal standards. *Panhandle Producers and Royalty Owners Ass'n v. Econ. Regulatory Admin*, 847 F.2d 1168, 1174 (5th Cir. 1988) (stating that a substantive rule is one that establishes standards of conduct that carry the force of law).  As such, Defendants should have complied with the APA's notice and comment requirement.  5 U.S.C. § 553; *Nat'l Min. Ass'n*, 758 F.3d at 251; *Chrysler Corp.*, 441 U.S. at 301–03.  Permitting the definition of sex to be defined in this way would allow Defendants to "create de facto new regulation" by agency action without complying with the proper procedures.  *Christensen v. Harris Cty.*, 529 U.S. 576, 586–88 (2000).  This is not permitted.

Accordingly the Court finds that Plaintiffs would likely succeed on the merits that Defendants violated the notice and comment requirements of the APA.

     *ii.*    *Agency Action Contrary to Contrary to Law (5 U.S.C. § 553)*

Plaintiffs contend that Defendants' Guidelines are contrary to the statutory and regulatory text, Congressional intent, and the plain meaning of the term.  Mot. Injunction 14, ECF No. 11. When an agency acts contrary to law, its action must be set aside.  5 U.S.C. § 706(2)(A). Plaintiffs argue that Defendants' interpretation of the meaning of the term "sex" as set out in the Guidelines contradicts its meaning in Title VII, Title IX, and § 106.33.  They assert "the meaning of the terms 'sex,' on the one hand, and 'gender identity,' on the other, both now and at the time

Titles VII and IX were enacted, forecloses alternate constructions." Mot. Injunction 16, ECF

No. 11 (citing *Thomas Jefferson Univ.*, 512 U.S. at 512. They also allege that the ordinary

meaning of the term controls. *Id.* at 17 (citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179,

187 (1995)).

Defendants contend that Plaintiffs' arguments for legislative history and intent at the time

of passage are irrelevant. Hr'g Tr. 33 ("But it may very well be that Congress did not intend the

law to protect transgender individuals. [But,] . . . as the Supreme Court has made it absolutely

clear in *Oncale*, the fact that Congress may have understood the term sex to mean anatomical sex

at birth is largely irrelevant.") Defendants also allege that "Title IX and Title VII should be

construed broadly" to protect any person, including transgendered persons, from discrimination.

Hr'g Tr. 33–34.

The starting point to analyze this dispute begins with the actual text of the statute or

regulation, where the words should be given their ordinary meaning. *Desert Palace, Inc. v.

Costa*, 539 U.S. 90, 98 (2003) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–

54 (1992)). When the words are unambiguous, the "judicial inquiry is complete." *Id.* (quoting

*Rubin v. United States*, 449 U.S. 424, 430 (1981)). The pertinent statutory text at issue in this

case provides: "No person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681. Title IX

expressly permits educational institutions to maintain separate living facilities for the different

sexes. *Id.* at § 1686. The other language at issue comes from one of the DOE regulations

promulgated to implement Title IX, which states: "A recipient may provide separate toilet,

locker room, and shower facilities on the basis of sex, but such facilities provided for students of

one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

Defendants assert the Guidelines simply provide clarity to an ambiguity in this regulation, and that ambiguity is how to define the term sex when dealing with transgendered students.  Defs.' Resp. 20, ECF No. 40.  Because they contend the regulation is ambiguous, Defendants argue "[f]oundational principles of administrative law instruct [the Court] to give controlling weight to [their] interpretations of their own ambiguous regulations unless [they are] plainly erroneous." *Id.*

Plaintiffs contend the text of both Title VII and Title IX is not ambiguous.  Mot. Injunction 16–19, ECF No. 11.  They argue when Congress passed both statutes it clearly intended sex to be defined based on the biological and anatomical differences between males and females.  *See id.* at 17–18 (citing legislative history and common understanding of its meaning at the time of passage).  Plaintiffs likewise assert § 106.33 is unambiguous, for the same reason, as it was designed to separate students based on their biological differences because they have a privacy right to avoid exhibiting their "nude or partially nude body, genitalia, and other private parts" before members of the opposite sex.  Pls.' Reply 8–9, ECF No. 52.  Based on this, they argue Defendants have manufactured an ambiguity so they can then unilaterally change the law to suit their policy preferences.  *Id.* at 8.

### iii.    *Auer Deference*

Because Defendants assert their regulation is ambiguous, the Court must determine whether their interpretation is entitled to deference.  Defendants contend an agency may interpret its own regulation by issuing an opinion letter or other guidance which should be given controlling weight if: (1) the regulation is ambiguous; and (2) the interpretation is not plainly

erroneous or inconsistent with the regulation.  Defs.' Resp. 21, ECF No. 40; *Christensen*, 529 U.S. at 588 ("*Auer* deference is warranted only when the language of the regulation is ambiguous."); *Auer v. Robbins*, 519 U.S. 452, 461 (1997) ("[An agency's] interpretation of [its regulation] is, under our jurisprudence, controlling unless 'plainly erroneous or inconsistent with the regulation.'") (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)).

This deference is only warranted however when the language of the regulation is ambiguous.  *Moore v. Hannon Food Services, Inc.*, 317 F.3d 489, 495 (5th Cir. 2003). Legislation is ambiguous if it is susceptible to more than one accepted meaning.  *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015).  "Multiple accepted meanings do not exist merely because a statute's 'authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope.'"  *Id.* (citing *Moore*, 317 F.3d at 497 *and* applying this rule of construction to regulations).

If a regulation is not ambiguous, the agency's interpretation may be considered but only according to its persuasive power.  *Moore*, 317 F.3d at 495.  "Thus, a court must determine whether 'all but one of the meanings is ordinarily eliminated by context.'"  *Calix*, 784 F.3d at 1005 (quoting *Deal v. United States*, 508 U.S. 129, 132–33 (1993)).  When a term is not defined, courts may generally give the words their common and ordinary meaning in accordance with legislative intent.  *D.C. Bd. of Elections & Ethics v. D.C.*, 866 A.2d 788, 798 n.18 (D.C. 2005) ("In finding the ordinary meaning, 'the use of dictionary definitions is appropriate in interpreting undefined statutory terms.'"); *1618 Twenty–First St. Tenants Ass'n, Inc. v. Phillips Collection*, 829 A.2d 201, 203 (D.C. 2003) (same).  Furthermore, "an agency is not entitled to deference when it offers up an interpretation of [a regulation] that [courts] have already said to be

unambiguously foreclosed by the regulatory text." *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 399 (5th Cir. 2014) (citing *Christensen*, 529 U.S. at 588).

Based on the foregoing authority, the Court concludes § 106.33 is not ambiguous. It cannot be disputed that the plain meaning of the term sex as used in § 106.33 when it was enacted by DOE following passage of Title IX meant the biological and anatomical differences between male and female students as determined at their birth. *See* 34 C.F.R. § 106.33; 45 Fed. Reg. 30955 (May 9, 1980); *Thomas Jefferson Univ.*, 512 U.S. at 512 (holding that intent determined at the time the regulations are promulgated). It appears Defendants at least tacitly agree this distinction was the intent of the drafter. *See* Holder Memo 1, ECF No. 6-3 ("The federal government's approach to this issue has also evolved over time."); *see also* Hr'g Tr. 33 ("[I]t may very well be that Congress did not intend the law to protect transgender individuals.").

Additionally, it cannot reasonably be disputed that DOE complied with Congressional intent when drawing the distinctions in § 106.33 based on the biological differences between male and female students. Pls.' Mot. Injunction 17–18, ECF No. 11 (citing legislative history and common understanding of its meaning at the time of passage). As the support identified by Plaintiffs shows, this was the common understanding of the term when Title IX was enacted, and remained the understanding during the regulatory process that led to the promulgation of § 106.33. *See* Pls.' Am. Compl. ¶¶ 8–13, ECF No. 6; *see also G.G.*, 822 F.3d at 736 (Niemeyer, J., dissenting) (providing comprehensive list of various definitions from the 1970s which demonstrated "during that time period, virtually every dictionary definition of 'sex' referred to the *physiological* distinctions between males and females, particularly with respect to their reproductive functions."). This undoubtedly was permitted because the areas identified by the regulations are places where male and female students may have to expose their "nude or

31

partially nude body, genitalia, and other private parts," and separation from members of the opposite sex, those whose bodies possessed a different anatomical structure, was needed to ensure personal privacy.  *See G.G.*, 822 F.3d at 723.

This conclusion is also supported by the text and structure of the regulations.  Section 106.33 specifically permits educational institutions to provide separate toilets, locker rooms, and showers based on sex, *provided* that the separate facilities are comparable.  The sections immediately preceding and following § 106.33 likewise permit educational institutions to separate students on the basis of sex.  For instance, § 106.32 permits educational institutions to provide separate housing for students on the basis of sex, again so long as the separate housing is comparable, and § 106.33 permits separate educational sessions for boys and girls when dealing with instruction concerning human sexuality.  34 C.F.R. §§ 106.32, 106.34.  Without question, permitting educational institutions to provide separate housing to male and female students, and separate educational instruction concerning human sexuality, was to protect students' personal privacy, or discussion of their personal privacy, while in the presence of members of the opposite biological sex.  *G.G.*, 822 F.3d at 723.  Accordingly, this interpretation of § 106.33 is consistent with the structure and purpose of the regulations.

Based on the foregoing, the Court concludes § 106.33 is not ambiguous.  Given this regulation is not ambiguous, Defendants' definition is not entitled to *Auer* deference, meaning it does not receive controlling weight.  *Auer*, 519 U.S. at 461.  Instead, Defendants' interpretation is entitled to respect, but only to the extent it has the power to persuade.  *Christensen*, 529 U.S. at 587.  In his dissent in *G.G.*, Judge Niemeyer characterized Defendants' definition as "illogical and unworkable."  *G.G.*, 822 F.3d at 737.  He outlined a number of scenarios, which need not be repeated here, where the Defendants' interpretation only causes more confusion for educational

institutions.  *Id.*  A definition that confuses instead of clarifies is unpersuasive.  Additionally, since this definition alters the definition the agency has used since its enactment, its persuasive effect is decreased.  *See Morton*, 415 U.S. at 237; *see also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012) (holding that an agency announcement of an interpretation preceded by a very lengthy period with no interpretation indicates agency considered prior practice lawful).  Accordingly, the Court concludes Defendants' interpretation is insufficient to overcome the regulation's plain language and for the reasons stated above is contrary to law.

### 2.  Threat of Irreparable Harm

The Court next addresses irreparable harm.  Defendants allege that Plaintiffs have not identified any pending or imminent enforcement action, and the Guidelines "expose [P]laintiffs to no new liability or legal requirements."  Defs.' Resp. 7, ECF No. 40 (citing *Google v. Hood*, 822 F.3d 212, 227 (5th Cir. 2016).  Defendants argue that, "[a]lthough [P]laintiffs *do* identify a small number of specific 'policies and practices' that they claim are in conflict with [D]efendants' interpretation of Title IX, they have identified no enforcement action being taken against them—now or in the future—as a result of these polices."  Defs.' Resp. 8–9, ECF No. 40.  They assert that even if DOE were "to decide to bring an administrative enforcement action against plaintiffs for noncompliance . . . at some point in the future, [P]laintiffs *still* would be unable to make a showing of irreparable harm because they would have an opportunity to challenge the interpretation in an administrative process prior to any loss of federal funds."  *Id.* at 9 (quoting *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975)).

Plaintiffs counter that "Defendants' actions cause irreparable harm by forcing policy changes, imposing drastic financial consequences, and usurping [Plaintiffs'] legitimate authority."  Mot. Injunction 21, ECF No. 11.  According to Plaintiffs, Defendants' actions

present "a Hobson's choice between violating federal rules (labeled as regulations, guidance, and interpretations) on the one hand, and transgressing longstanding policies and practices, on the other." *Id.* Thus, Plaintiffs characterize Defendants' administrative letters and notices as "mandates" which effectively carry the force of law. *Id.* Plaintiffs also allege that Defendants' rules are "irreconcilable with countless polices regarding restrooms, showers, and intimate facilities," while threatening to override the practices of "countless schools," which had previously been allowed to differentiate intimate facilities on the basis of biological sex consistent with Title IX, federal regulations, and laws protecting privacy and dignity. *Id.* (citing Mot. Injunction, Ex. P. (Thweatt Dec.) 5–7, ECF No. 11-2).

Defendants' appear to concede the Guidelines conflict with Plaintiffs' policies and practices, *see* Defs.' Resp. 8–9; ECF No. 40 ("[P]laintiffs do identify a small number of specific 'policies and practices' . . . ."); however, they argue that additional threats of enforcement are required before irreparable harm exists. Case law does not support this contention. Instead the authorities hold, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *See Coalition for Econ. Equity v. Wilson,* 122 F.3d 718, 719 (9th Cir. 1997) (stating, whenever an enactment of a state's people is enjoined, the state suffers irreparable injury); *accord Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (citing *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., *in chambers*) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

34

As Defendants have conceded the conflict between the Guidelines and Plaintiffs' policies, and Plaintiffs have identified a number of statutes that conflict, the Court concludes Plaintiffs have sufficiently demonstrated a threat of irreparable harm.[20]

3.      <u>Balance of Hardships and Public Interest</u>[21]

The Court next considers whether the threatened injury to the Plaintiffs outweighs whatever damage the proposed injunction may cause Defendants and its impact on the public interest. *Nichols*, 532 F.3d at 372. Plaintiffs risk either running afoul of Defendants' Guidelines or complying and violating various state statutes and, in some cases, their state constitutions. Mot. Injunction 21, ECF No. 11. Plaintiffs also state that they likely risk legal action from parents, students, and other members of their respective communities should they actually comply with Defendants' Guidelines. Defendants argue these harms do not outweigh the damage that granting the injunction will cause because it will impede their ability to eliminate discrimination in the workplace and educational settings, prevent them from definitively explaining to the public the rights and obligations under these statutes, and it would have a deleterious effect on the transgendered.

The Court concludes Plaintiffs have established that the failure to grant an injunction will place them in the position of either maintaining their current policies in the face of the federal government's view that they are violating the law, or changing them to comply with the Guidelines and cede their authority over this issue. *See* DOJ/DOE Letter, ECF No. 6-10 ("This letter summarizes a school's Title IX obligations regarding transgender students and explains

---

[20] Defendants also contend the injunction should be denied because Plaintiffs delayed in seeking this relief. The DOJ/DOE Letter is dated May 13, 2016. This case was filed very soon after on May 25, 2016, and the parties reached an agreement on a briefing schedule to consider this request. The Court concludes Plaintiffs did not fail to act timely.

[21] The Parties address the third and fourth Canal factors together, therefore they are treated together in this Order as well.

how [DOE and DOJ] evaluate a school's compliance with these obligations.").  Plaintiffs' harms in this regard outweigh those identified by Defendants, particularly since the Supreme Court stayed the Fourth Circuit's decision supporting Defendants' position, and a decision from the Supreme Court in the near future may obviate the issues in this lawsuit.  As a result, Plaintiffs interests outweigh those identified by Defendants.   Further, Defendants have not offered evidence that Plaintiffs are not accommodating students who request an alternative arrangement.  Indeed, the school district at issue in *G.G.* provided its student an accommodation.

Accordingly, the Court finds that Plaintiffs have met their burden and these factors weigh in favor of granting the preliminary injunction.

## C.      Scope of the Injunction

Finally, the Court must determine the scope of the injunction.  Plaintiffs seek to apply the injunction nationwide.  Mot. Injunction 3, ECF No. 11; Pls.' Reply 13, ECF No. 52.  Defendants counter that the injunction should be narrowly tailored to Plaintiffs in the Fifth Circuit.  Defs.' Resp. 28, ECF No. 40.

"Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction."  *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979).  "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."  *Id.* at 702 (permitting a nationwide injunction because the class action was proper and finding that a nationwide injunction was not more burdensome than necessary to redress plaintiffs' complaints).

The Court concludes this injunction should apply nationwide.  As the separate facilities provision in § 106.33 is permissive, states that authorize schools to define sex to include gender

identity for purposes of providing separate restroom, locker room, showers, and other intimate facilities will not be impacted by it.   Those states who do not want to be covered by this injunction can easily avoid doing so by state law that recognizes the permissive nature § 106.33. It therefore only applies to those states whose laws direct separation.   However, an injunction should not unnecessarily interfere with litigation currently pending before other federal courts on this subject regardless of the state law.   As such, the parties should file a pleading describing those cases so the Court can appropriately narrow the scope if appropriate.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs' application for a preliminary injunction (ECF No. 11) should be and is hereby **GRANTED**.   *See* Fed. R. Civ. P. 65.   It is **FURTHER ORDERED** that bond is set in the amount of one hundred dollars.[22]   *See* Fed. R. Civ. P. 65(c).   Defendants are enjoined from enforcing the Guidelines against Plaintiffs and their respective schools, school boards, and other public, educationally-based institutions.   Further, while this injunction remains in place, Defendants are enjoined from initiating, continuing, or concluding any investigation based on Defendants' interpretation that the definition of sex includes gender identity in Title IX's prohibition against discrimination on the basis of sex. Additionally, Defendants are enjoined from using the Guidelines or asserting the Guidelines carry weight in any litigation initiated following the date of this Order.   All parties to this cause of action must maintain the status quo as of the date of issuance of this Order and this preliminary injunction will remain in effect until the Court rules on the merits of this claim, or until further direction from the Fifth Circuit Court of Appeals.   This preliminary injunction shall be binding on Defendants and any officers, agents, servants, employees, attorneys, or other

---

[22] Neither party addressed the appropriate bond amount should an injunction be entered.

persons in active concert or participation with Defendants, as provided in Federal Rule of Civil Procedure Rule 65(d)(2).

**SO ORDERED** on this **21st day** of **August, 2016.**

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT C

**Order on Motion for Clarification
(ECF No. 86) (Oct. 18, 2016)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 7:16-cv-00054-O** |
| **UNITED STATES OF AMERICA** | § | |
| **et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>ORDER</u>

Before the Court are Defendants' Notice of Pending Litigation (ECF No. 61), filed August

30, 2016; Plaintiffs' Notice of Pending of Litigation (ECF No. 64), filed September 9, 2016; and

Defendants' Reply Regarding Pending Litigation (ECF No. 72), filed September 14, 2016.  Also

before the Court are Defendants' Motion for Clarification (ECF No. 65), filed September 12, 2016;

Plaintiffs' Response (ECF No. 73), filed September 19, 2016, and Defendants' Reply (ECF No.

74), filed September 23, 2016.  The Court held a hearing on September 30, 2016 to address the

issues raised in these pleadings.  *See* ECF No. 76.  Defendants seek to clarify the Court's

preliminary injunction in this case.

The parties have agreed in their briefing that the injunction is directed at the issue of access

to intimate facilities.  Pls.' Resp. Mot. Clarify 3–5, ECF No. 73; Defs.' Reply Mot. Clarify 1–2

n.1–2, ECF No. 74.  At oral argument Plaintiffs' counsel agreed that Defendants may offer textual

analyses of Title IX and Title VII in cases where the Government and its agencies are defendants,

and if the United States Supreme Court or any Circuit Court requests that Defendants file amicus

curiae briefs, they may do so.  Tr'g 26–28; 32–33.  Thus, the remaining issues related to the request for clarification appear to be (1) whether Defendants' Guidelines are enjoined in total or whether the principle of severability applies to them; (2) whether the injunction applies to Title VII investigations, particularly as it applies to workplaces where school teachers or school staff may or must use the same intimate facilities as students; (3) whether the injunction applies to OSHA or DOL activity; (4) whether the injunction prevents Government agencies from carrying out their statutory duties, which traditionally fall within their core missions to prevent various forms of discrimination; and (5) the geographic scope of the injunction.  Mot. Clarify 6–11, 16–21, ECF No. 65.

Having considered the parties' submissions and applicable law, the Court finds that the parties must provide additional briefing on whether the Defendants' Guidelines are enjoined in total or whether the principal of severability applies to them, whether Title VII is implicated by this injunction, and whether the injunction applies to OSHA or DOL activity.  Plaintiffs must submit a response addressing these issues on or before **October 24, 2016**.  Defendants must submit a reply on or before **October 28, 2016**.

Furthermore, the Court offers the following clarifications to its August 21, 2016 Order granting the preliminary injunction (ECF No. 58):

## I.     NATIONWIDE INJUNCTION

The Court's August 21, 2016 Order granted a nationwide injunction.  ECF No. 58. Defendants argue that "the geographic scope of the Preliminary Injunction [] could be read to exceed the proper scope of relief available to the [P]laintiffs in this case" and they contend that this "would run afoul of the Supreme Court's admonition that 'injunctive relief should be no more

2

burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" Mot. Clarify 2, 16, ECF No. 65 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); Defs.' Reply 2–4, ECF No. 74; Tr'g at 6–7. According to Defendants, they have a right to rely on the Guidelines in litigation before other courts that have agreed with their interpretation of sex in Title VII and IX to mean gender identity. Tr'g at 7.

Plaintiffs argue that "Defendants are federal administrators and agencies, with footings in every state and territory" and they are "collectively and systematically engaged in enforcing a pervasive and unlawful rule across the country . . . ." Resp. Mot. Clarify 9–10, ECF No. 73. "An injunction that precludes Defendants from acting everywhere[,]" Plaintiffs contend, "is quite clear." *Id.*; Tr'g at 17–19 (arguing that the geographic extent of the harm Plaintiffs suffer is nationwide). The Court agrees that the scope of this injunction should be and is nationwide.

As stated in one of the most recent *Texas v. United States* Fifth Circuit opinions, "the Constitution vests the District Court with 'the judicial Power of the United States[,]'" and "[t]hat power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (quoting U.S. Const. art. III, §1), *aff'd by equally divided Supreme Court*, 136 S. Ct. 2271 (June 23, 2016) (finding that a nationwide injunction was warranted because "partial implementation of DAPA would 'detract from the integrated scheme of regulation created by Congress,'" and create a "substantial likelihood that a geographically-limited injunction would be ineffective . . . ."); *see also Chevron Chem. Co. v. Voluntary Purchasing Grps.*, 659 F.2d 695, 705–06 (5th Cir. 1981) (directing the district court to issue broad injunction on remand in a trade dress case); *Califano*, 442 U.S. at 702 (finding that the

3

scope of an injunction is dictated by the extent of the violation, not the geographical extent of the plaintiff class, thus a nationwide injunction was consistent with the principles of equity); *Brennan v. J.M. Fields, Inc.*, 488 F.2d 443, 449–50 (5th Cir. 1973) (affirming a nationwide injunction against a national chain); *Hodgson v. First Fed. Sav. & Loan Ass'n*, 455 F.2d 818, 826 (5th Cir. 1972) ("[C]ourts should not be loath to issue injunctions of general applicability . . . . The injunctive processes are a means of effecting general compliance with national policy as expressed by Congress, a[s] public policy judges too must carry out—actuated by the spirit of the law and not begrudgingly as if it were a newly imposed fiat of a presidium."); *Wirtz v. Ocala Gas Co.*, 336 F.2d 236, 240 (5th Cir. 1964) (describing certain FLSA injunctions as "sufficiently broad and general to enjoin any practices which would constitute violations of the Act's provisions").

It is clear from Supreme Court and Fifth Circuit precedent that this Court has the power to issue a nationwide injunction where appropriate. Both Title IX and Title VII rely on the consistent, uniform application of national standards in education and workplace policy. A nationwide injunction is necessary because the alleged violation extends nationwide. Defendants are a group of agencies and administrators capable of enforcing their Guidelines nationwide, affecting numerous state and school district facilities across the country. *Texas*, 809 F.3d at 187–88. Should the Court only limit the injunction to the plaintiff states who are a party to this cause of action, the Court risks a "substantial likelihood that a geographically-limited injunction would be ineffective." *Id.*[1]

---

[1] As noted previously, "Those states who do not want to be covered by this injunction can easily avoid doing so by state law that recognizes the permissive nature § 106.33. It therefore only applies to those states whose laws direct separation. However, [this] injunction should not unnecessarily interfere with litigation currently pending before other federal courts on this subject regardless of the state law." Order 37, ECF No. 58.

4

Accordingly, Defendants Motion to Clarify is **DENIED** as they request that the Court limit the injunction to plaintiff states.

## II.     INJUNCTION DOES NOT AFFECT DEFENDANTS' CORE MISSIONS

Defendants argue that the Court's Preliminary Injunction Order (ECF No. 58) should clarify that it does not enjoin the EEOC from fulfilling statutory duties necessary to protect the rights of individuals alleging discrimination and that it does not affect programs which combat discrimination based on race, national origin, or disability and other activities, or limit the enforcement of anti-discrimination statues outside the plaintiff states. *See* Mot. Clarify 6–11, 16–21, ECF No. 65 (citing 42 U.S.C. § 2000e-5(b), (e)(1), (f)(1); *E.E.O.C. v. Bass Pro Outdoors World, L.L.C.*, No 15-20078, 2016 WL 3397696, at *8 (5th Cir. June 17, 2016); 29 C.F.R § 1614). The Court **CLARIFIES** that these duties are not affected by the Preliminary Injunction Order (ECF No. 58).

Indeed, the Court's Order did not purport to alter any statute or statutory duties Defendants may exercise in pursuit of their governmental duties under Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and Title II of the American with Disabilities Act of 1990. This injunction also does not affect a school's obligation to investigate and remedy student complaints of sexual harassment, sex stereotyping, and bullying.

Defendants are simply prevented from using the Guidelines to argue that the definition of "sex" as it relates to intimate facilities includes gender identity. Order 36–37, ECF No. 58. The Court's preliminary injunction neither affects EEOC's fulfillment of its statutory duties, nor Defendants' ability to enforce anti-discrimination statutes nationwide. The injunction does not affect those programs addressing discrimination on the basis of race, national origin, or disability.

Defendants are simply "enjoined from using the Guidelines or asserting the Guidelines carry weight in any litigation initiated following the date of [its August 21, 2016] Order."[2]  Order 37, ECF No. 58.

## III.   CONCLUSION

Accordingly, the Court clarifies that: (1) the preliminary injunction applies nationwide; and (2) Defendants' core missions to combat discrimination based on race, national origin, or disability, and the EEOC's statutory duties are not otherwise affected by the preliminary injunction (ECF No. 58).

The injunction is limited to the issue of access to intimate facilities.  Defendants are enjoined from relying on the Guidelines, but may offer textual analyses of Title IX and Title VII in cases where the Government and its agencies are defendants or where the United States Supreme

---

[2] Plaintiffs have also listed numerous cases that they believe are not enjoined by the Court's preliminary injunction in their Notice of Pending Litigation.  *See* Not. Pending Lit. 10–13, ECF No. 64.  The Court agrees and clarifies that these cases are not included in the injunction.  At oral argument, Defendants asked the Court to restrict the injunction to litigation in which the plaintiff states are involved.  Tr'g at 7–8.  The Court clarifies that the preliminary injunction attaches to Defendant's conduct in litigation not substantially developed before the August 21, 2016 Order (ECF No. 58), regardless of whether plaintiff states are involved.  The Court seeks to avoid unnecessarily interfering with litigation concerning access to intimate facilities that was substantially developed before the Court's Order granting the preliminary injunction.  In pending litigation concerning access to intimate facilities, if no responsive pleadings were filed and no substantive rulings issued before August 21, 2016, the preliminary injunction applies and Defendants are enjoined from relying on the Guidelines.  The injunction applies in part to *United States v. Southeastern Okla. Univ.*, a case filed by the DOJ against a public university in Oklahoma (a plaintiff state here) more than a year before the Court's August 21, 2016 injunction.  No. 5:15-cv-324 (W.D. Okla.).  Although the DOJ did not make the issue at the heart of this injunction (access to intimate facilities) a central feature of the complaint, the aggrieved private party has now intervened and introduced new claims that involve access to intimate facilities.  No. 15:15-cv-324, ECF No. 23.  Because litigation in *Southeastern* was substantially underway before the issuance of this injunction, DOJ's legal arguments in the case fall outside the scope of this injunction.  However, Defendants (including DOJ) are still "enjoined from enforcing the Guidelines against Plaintiffs and their respective schools, school boards, and other public, educationally-based institutions" (including Southeastern Oklahoma State University) and "enjoined from initiating, continuing, or concluding any investigation based on Defendants' interpretation that the definition of sex includes gender identity in Title IX's prohibition against discrimination on the basis of sex".  ECF No. 58 at 37.

Court or any Circuit Court request that Defendants file amicus curiae briefing on this issue.  The parties are **ORDERED** to brief the remaining issues of whether the Defendants' Guidelines are enjoined in total or whether the principal of severability applies to them, whether the injunction implicates Title VII in any manner (and specifically where school employees and staff may share intimate facilities with students), and whether OSHA or DOL activity is implicated by the injunction.  Plaintiffs must respond on or before **October 24, 2016**, and Defendants must reply on or before **October 28, 2016.**

       **SO ORDERED** on this **19th day** of **October, 2016.**


_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

7

# EXHIBIT D

**Order Denying Stay**
**(ECF No. 100) (Nov. 20, 2016)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 7:16-cv-00054-O** |
| **UNITED STATES OF AMERICA** | § | |
| **et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER

Before the Court are Defendants' Motion for Partial Stay of the Court's Preliminary Injunction Order (ECF No. 95), filed November 7, 2016; and Plaintiffs' Response (ECF No. 99), filed November 15, 2016. Defendants seek a partial stay, pending appeal, as to the preliminary injunction's application to states and entities not plaintiffs in this case and have requested expedited consideration of their motion. *Id.* at 7. After considering the briefing and applicable law, the Court finds that Defendants' motion for partial stay of the Court's preliminary injunction should be and is hereby **DENIED**.

## I.      BACKGROUND

The Court issued the nationwide preliminary injunction at issue on August 21, 2016. ECF No. 58. Defendants filed a motion for clarification on September 12, 2016, requesting, among other things, that the Court narrow the scope of its injunction to plaintiff states. *See* Defs.' Mot. Clarify, ECF No. 65. The Court issued clarification on October 18, 2016, reemphasizing the injunction's nationwide scope and specifying its impact on Defendants. ECF No. 86. Two days

1

later, Defendants filed a Notice of Appeal to the Fifth Circuit Court of Appeals seeking interlocutory review of the Court's injunction and clarification order.  ECF No. 88.  In the present motion, Defendants ask the Court to reconsider the nationwide scope of its injunction by requesting a partial stay, pending appeal, of the injunction's application to non-plaintiff states and entities. Defs.' Mot. 7, ECF No. 95.  Defendants reassert several arguments the Court previously addressed at length and the Court will not repeat its analysis on those issues.

## II.    ANALYSIS

### A.  Defendants are Unlikely to Succeed on Appeal and Suffer No Irreparable Injury

A party seeking stay of an injunction bears the burden of demonstrating (1) likelihood of success on the merits; (2) likelihood the applicant will be irreparably injured absent a stay; (3) that issuance of a stay will not substantially injure the other parties; and (4) that the stay is in the public interest.  *See Texas v. United States*, 787 F.3d 733, 746–47 (5th Cir. 2015) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)).  The first two factors "are the most critical."  *Nken*, 556 U.S. at 434.

"A stay is not a matter of right, even if irreparable injury might otherwise result," and the propriety of issuing a stay depends on the circumstances of the particular case.  *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013) (quoting *Nken*, 556 U.S. at 427).  The decision to grant or deny a stay is committed to the trial court's sound discretion.  *Nken*, 556 U.S. at 433.

The Court remains convinced that Plaintiffs, not Defendants, have shown a great likelihood of success on the merits of their claims; and incorporates herein the analysis developed in its August 21, 2016 Order issuing the preliminary injunction.  Aug. 21, 2016 Order 2, ECF No. 58 (finding "Defendants failed to comply with the Administrative Procedures Act by: (1) foregoing

the Administrative Procedures Act's notice and comment requirements; and (2) issuing directives which contradict the existing legislative and regulatory texts.").

Additionally, Defendants fail to show they will suffer irreparable injury absent a stay. The first part of the enjoined Guidelines[1] was issued in 2010 and the most recent component on May 13, 2016, just days after the Department of Justice ("DOJ") seemingly began nationwide enforcement, suing North Carolina for upholding the right to sex-designated intimate facilities.[2] Aug. 21, 2016 Order 3, ECF No. 58. The federal statutes prohibiting discrimination on the basis of "sex"—the scope and meaning of which Defendants claim now includes gender identity—were promulgated more than forty years ago.[3] *See id.* The federal government did not articulate, much less enforce, the Guidelines' interpretation of sex as including gender identity for nearly fifty years after Title VII was passed in 1964 and the Court views this delay as strong evidence that Defendants will suffer no irreparable injury if a stay is denied and enforcement of the Guidelines delayed until their legality is established.

In requesting the Court remove non-plaintiff states from the injunction's reach, Defendants claim that "[non-plaintiff states] are in a better position than Plaintiffs or this Court to assess their own interests and injuries." Defs.' Mot. 16, ECF No. 95. But the injunction only restricts Defendants from enforcing or relying on the Guidelines; and leaves non-plaintiff states free to

---

[1] The Guidelines refer to the documents attached to Plaintiffs' Amended Complaint: (1) Ex. A (DOE Bullying Memo 2010), ECF No. 6-1; (2) Ex. B (DOE Questions and Answers on Title IX and Sexual Violence Memo) ("DOE Q&A Memo), ECF No. 6-2; (3) Ex. C ("Holder Memo 2014"), ECF No. 6-3, (4) Ex. D (OSHA Best Practice Guide), ECF No. 6-4; (5) Ex. H (EEOC Fact Sheet), ECF No. 6-8; and (6) Ex. J (DOJ/DOE Dear Colleague Letter), ECF No. 6-10.
[2] *United States v. North Carolina*, No. 1:16-cv-425 (M.D.N.C.) (filed May 9, 2016).
[3] Title IX of the Education Amendments of 1972 ("Title IX") and Title VII of the Civil Rights Act of 1964 ("Title VII").

exercise their judgment in crafting and enforcing legislation with respect to intimate facilities.[4] Defendants also claim the injunction burdens non-plaintiff states by "denying them the benefit of federal antidiscrimination enforcement."  Defs.' Mot. 16, ECF No. 95.  But non-plaintiff states continue to enjoy the benefit of all federal antidiscrimination enforcement that falls outside the injunction—combatting "discrimination based on race, national origin, or disability." Aug. 21, 2016 Order 5, ECF No. 86.  Further, the injunction "does not affect a school's obligation to investigate and remedy student complaints of sexual harassment, sex stereotyping, and bullying." Oct. 18, 2016 Order 5, ECF No. 86.  Defendants grossly misstate the injunction's scope in claiming it prohibits states from receiving "federal enforcement of the civil rights laws."  Defs.' Mot. 16, ECF No. 95.  The Court emphasized in its clarification order and reiterates here that the injunction does not prevent Defendants from continuing their core mission of enforcing the federal civil rights laws enacted by Congress.

### B. Breadth of Injunction

As previously emphasized, this Court possesses the power to issue a nationwide injunction and finds such relief appropriate in the present case.  "[T]he Constitution vests the District Court with 'the judicial power of the United States.'  That power is not limited to the district wherein the court sits but extends across the country.  It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction."  *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (quoting U.S. Const. art. III, §1).  "The scope of injunctive relief is dictated by the

---

[4] "As the separate facilities provision in [34 C.F.R.] § 106.33 is permissive, states that authorize schools to define sex to include gender identity for purposes of providing separate restroom, locker room, showers, and other intimate facilities will not be impacted by [the preliminary injunction]."  Aug. 21, 2016 Order 36–37, ECF No. 58.

extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamaski*, 442 U.S. 682, 702 (1979).

A nationwide injunction is appropriate in this case because Plaintiffs have presented a strong facial challenge to the Guidelines, arguing they violate the Administrative Procedures Act ("APA") by skirting the notice and comment process and contradicting existing law. Where a party brings a facial challenge alleging that agency action violated APA procedures, a nationwide injunction is appropriate. *See, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1407–08 (D.C. Cir. 1998) (invalidating an agency rule and affirming the nationwide injunction); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").

Federal courts in the Fifth Circuit regularly enjoin enforcement of new federal regulations challenged as unlawful. *See, e.g.*, *Texas v. United States*, 787 F.3d 733, 743 (5th Cir. 2015) (enjoining executive order inconsistent with immigration statutes); *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-cv-00066 (N.D. Tex. June 27, 2016), appeal pending (5th Cir.) (permanently enjoining Department of Labor persuader rule inconsistent with labor statutes); *Associated Builders & Contractors of Se. Tex. v. Rung*, No. 1:16-cv-00425 (E.D. Tex. Oct. 24, 2016) (enjoining executive order and agency guidance inconsistent with labor statutes). This injunction, and the justification for its nationwide scope, centers on agency regulations that Plaintiffs allege are invalid on their face. But none of the authorities relied on by Defendants in their request for a partial stay center on agency regulations challenged as facially invalid. *See generally* Defs.' Mot., ECF No. 95. The Court finds the Guidelines' alleged facial defects warrant broad injunctive relief.

5

The Court also finds Defendants' appeal to the importance of circuit splits unpersuasive given the Supreme Court's recent grant of certiorari in *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016), *recalling mandate & issuing stay*, 136 S. Ct. 2442 (2016), *cert. granted*, 2016 WL 4565643 (U.S. Oct. 28, 2016) (No. 16-273).  The Supreme Court's upcoming review of *G.G.* diminishes the usual importance of a circuit split and may determine the legality of the Guidelines at issue here, abbreviating any alleged harm suffered by Defendants.  *See* Defs.' Mot. 12–14, ECF No. 95; *see also* Pls.' Resp. 7–8, ECF No. 99.

## III.    CONCLUSION

For the foregoing reasons, the Court finds that Defendants failed to demonstrate a likelihood of success or irreparable harm sufficient to justify a partial stay of the Court's preliminary injunction.  Accordingly, the Court hereby **DENIES** Defendants' Motion for a Partial Stay of the Court's August 21, 2016 Preliminary Injunction Order (ECF No. 95).

**SO ORDERED** on this **20th day** of **November, 2016.**

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**